## UNITED STATES DISTRICT COURT
## IN AND FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

DEBRA HARRIS and BARBARA
STARK, on behalf of themselves
and all others similarly situated,

JURY TRIAL DEMANDED

      Plaintiffs,

Case No.: _____

v.

NORDYNE, LLC,

      Defendant.

_____/

## CLASS ACTION COMPLAINT

Plaintiffs, Debra Harris and Barbara Stark, by and through the undersigned counsel, bring this class action complaint against Defendant, Nordyne, LLC, and allege as follows:

## NATURE OF THE CASE

1.     Plaintiffs, Debra Harris and Barbara Stark (collectively, "**Plaintiffs**"), bring this action on behalf of themselves and all other similarly situated Florida consumers who purchased residential heating, ventilation and air conditioning ("**HVAC**") systems manufactured, distributed and sold by Defendant, Nordyne LLC, that uniformly included defective copper evaporator coils.

2.     The defects within the copper evaporator coils used in Defendant's HVAC systems existed at the time of manufacture, distribution and sale, and were known or should have been known to Nordyne at all relevant times. The defective coils have caused Nordyne's HVAC systems to prematurely fail due to the leakage of refrigerant stored within the coils. This leakage

1

prevents the HVAC systems from performing their primary function of generating cool air.  This is particularly problematic in Florida, where the heat often reaches extreme temperatures.

3.     Nordyne knew or should have known that the coils in their HVAC systems were uniformly defective before it distributed and sold the HVAC systems.  Nordyne also knew that their HVAC systems were likely to fail prematurely, and had already failed in many instances. Nonetheless, Nordyne failed to remedy the problem or notify consumers of the defect.

4.     As a direct result of the defective copper evaporator coils, Plaintiffs and putative Class Members incurred out-of-pocket expenses in connection with the replacement of refrigerant and the professional labor costs associated with the repair and replacement of Defendant's defective evaporator coils.  Additionally, Plaintiffs and putative Class Members would not have purchased HVAC systems manufactured by Defendant, or would have paid less for their HVAC systems, had they known about the defect.

## PARTIES

5.     Plaintiff, Debra Harris ("**Harris**"), is a citizen and resident of Florida.   In September 2011, Harris purchased a Broan brand HVAC system from an authorized Broan retailer, which was installed in her Florida residence.   Defendant Nordyne manufactured, distributed and sold this HVAC system under the Broan brand name.

6.     Plaintiff, Barbara A. Stark ("**Stark**"), is a citizen and resident of Florida.   In February 2012, Stark purchased a Frigidaire brand HVAC system from an authorized Frigidaire retailer, which was installed in her Florida residence.   Defendant Nordyne manufactured, distributed and sold this HVAC system under the Frigidaire brand name.

7.     Defendant, Nordyne, LLC ("**Nordyne**"), is a Delaware limited liability company with corporate headquarters located in O'Fallon, Saint Charles County, Missouri, which

2

manufactures, distributes and sells HVAC systems.   Specifically, Nordyne manufactures consumer heating and cooling systems under the brand names of Broan, Frigidaire, Maytag, NuTone, Tappan, Westinghouse, Intertherm, Miller, Broan Manufactured Housing, Gibson, Kelvinator, Philco and Mammoth.   At all times relevant to this Complaint, Nordyne was registered with the state of Florida as a foreign limited liability company and transacted business within the State by distributing and selling its products to Florida-based retailers for sale to Florida consumers.   In addition, Nordyne maintains international headquarters in Miami, Miami-Dade County, Florida.

## JURISDICTION AND VENUE

8.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), as the matter in controversy, exclusive of interest and costs, exceeds the amount of $5,000,000 and is a class action wherein the putative Class Members are citizens of a state different from Defendant.

9.     Venue lies in this District, pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, Defendant conducts and transacts business in this Judicial District, and Defendant has intentionally availed itself of the laws and markets within this District by maintaining its international headquarters here, and through the distribution of its HVAC systems in this District.  Therefore, Defendant is subject to personal jurisdiction in this Judicial District.

## FACTUAL ALLEGATIONS

10.     At all times relevant to this Complaint, Nordyne manufactured, distributed and sold residential HVAC systems throughout the state of Florida.  Nordyne knew these products would be, and intended for them to be, purchased by Florida consumers and installed in their homes.

3

11.     Nordyne represents itself to the public as a "trusted name in the industry" that has been "designing and manufacturing reliable heating and cooling products for more than 90 years."  Nordyne further represents that it "focuses on creating genuine value for its customers through a unique combination of innovation, product performance and responsive support." Accordingly, Plaintiffs and putative Class Members reasonably expected Nordyne's HVAC systems to function properly and be reliable and of high quality.   Nonetheless, Nordyne systemically and uniformly manufactured, distributed and sold defective HVAC systems into the stream of commerce, to the detriment of consumers, including Plaintiffs and Class Members. Nordyne's actions – or inactions – were and are substantially injurious to consumers, who were and are burdened with the costs of having to prematurely repair their HVAC systems due to the defective evaporator coils utilized in Defendant's HVAC systems.

12.     HVAC systems, including those manufactured by Nordyne, traditionally consist of two major components – an air handler, which is located inside the home, and a compressor, which is located outside the home.

13.     The air handler contains the evaporator coil, which is arguably the most vital part of an HVAC system.  The function of the evaporator coil is to cool air within the home.  An evaporator coil consists of metal tubing and fins within the HVAC unit and is filled with refrigerant.  When air passes over the coil, refrigerant contained within the coil absorbs heat from the air and sends it back into the home in the form of cool air.  Refrigerant is not consumed in this process and is only lost if there is a leak in the evaporator coils containing the refrigerant.

14.     For more than four decades, HCFC-22 ("**R-22**") was the refrigerant that HVAC manufacturers used in their evaporator coils.  Unfortunately, this particular refrigerant is a greenhouse gas that contributes to ozone depletion, and its manufacture creates a by-product

called HFC-23, which contributes to global warming.   As a result, the United States Environmental Protection Agency prohibited the manufacturing of appliances or components requiring R-22 refrigerant after January 1, 2010.

15.      The phasing out of R-22 refrigerant required HVAC manufacturers to utilize an alternative refrigerant in HVAC systems that would not pose similar environmental concerns. To this end, R-410A became the preferred refrigerant for HVAC manufacturers in their evaporator coils.   This refrigerant provides higher system efficiencies through reduced power consumption and also reduces the impact on global warming.

16.      R-410A works at an operating pressure approximately 50% higher than that of R-22 for the same temperature.   For example, at a temperature of 150° F, R-22 operates at 380 pounds per square inch ("**PSI**"), while R-410A operates at 614 PSI.   As a result, HVAC systems utilizing R-410A require parts designed specifically for use with this high pressure refrigerant.

17.      Traditionally, evaporator coils were manufactured from copper.   In recent years, the price of copper has escalated, prompting some manufacturers to use thinner copper, while others have abandoned copper altogether in favor of less costly aluminum.

18.      Copper's susceptibility to formicary corrosion is another significant reason that HVAC manufacturers have transitioned from copper to aluminum coils.   Formicary corrosion (sometimes referred to as "ant's nest corrosion") is triggered by the presence of four components: water, oxygen, copper and an organic acid.   The collective presence of these components produces a pattern of microscopic ant-like tunnels across the coils, which compromises the integrity of the coils.   This corrosion ultimately causes copper evaporator coils to fail and the refrigerant to leak from corrosion-induced holes or cracks.   Because the refrigerant

is meant to remain inside the evaporator coil and at a consistent level, coil failure prevents an HVAC system from generating cool air, which is the system's primary function.

19.     Notably, if one of the four components of formicary corrosion is eliminated, then the corrosion will not occur.  In recognition of this fact and the problems posed by formicary corrosion, certain HVAC manufacturers transitioned from copper to aluminum evaporator coils as early as 2005.  Nordyne knew, or should have known, of the defect in the copper evaporator coils contained within its HVAC systems.  Nonetheless, despite industry-wide knowledge of the significant problems posed by formicary corrosion, including the likelihood of premature coil failure, Nordyne did not begin using aluminum evaporator coils until 2010.  Even then, the aluminum coils were only incorporated into select air handlers.  Indeed, Nordyne continued using the problematic copper evaporator coils in its air handlers through at least 2012.  At the same time that Nordyne was placing defective copper evaporator coils into the stream of commerce, Nordyne conceded on its Web site that the "copper alloy that these coils are made out of is susceptible to a deadly triad of common household items (namely: oxygen, moisture in the air and organic acids found in numerous items)" and that "[u]ltimately they mean that refrigerant will leak out of the coils and result in a costly repair or replacement."

20.     Despite having knowledge of the problems posed by formicary corrosion, including the likelihood of premature coil failure, Nordyne failed to disclose or otherwise notify Plaintiffs and putative Class Members of problems inherent in its copper evaporator coils or that the coils were likely to fail, and in certain instances already had failed.  Nor did Nordyne disclose or otherwise notify Plaintiffs and putative Class Members that they should anticipate incurring unnecessary out-of-pocket expenses in connection with the repairs and replacements necessitated by the above-described problems.

21.     Nordyne's copper evaporator coils were and are materially defective in their design or manufacturing.  Refrigerant prematurely leaks from cracks or holes in Nordyne's copper evaporator coils after the HVAC systems housing the coils were and are purchased and installed.  This defect prevents the HVAC system from generating cool air and causes consumers to incur unnecessary out-of-pocket expenses in connection with the repair or replacement of the defective evaporator coils and replacement refrigerant.  This defect was not known to and could not have been discovered by consumers acting reasonably under the circumstances.

22.     Rather than remedy the defect, Nordyne continued to manufacture and distribute HVAC systems sold to Florida consumers without disclosing the defect to these consumers. Indeed, Nordyne failed to disclose to consumers that its HVAC systems would likely fail due to the defective copper evaporator coils used in its air handlers, and that consumers should anticipate paying out-of-pocket expenses to replace refrigerant and for the labor associated with the repair or replacement of the defective coils.  Such costs are not incurred when an HVAC system functions properly.

23.     Further, Nordyne failed to disclose to consumers that, because the defective copper evaporator coils cause refrigerant to leak and compromise the performance of the HVAC system, the coils would increase consumers' utility bills, as the system must be on more frequently and for longer periods of time in an effort to generate cool air.

24.     Upon information and belief, Nordyne's evaporator coils were manufactured from copper tubing that was too thin for its intended purpose.  As a result, the coils prematurely failed, causing refrigerant to leak and preventing the HVAC system from generating cool air, which is its primary function.

25.     Further, Nordyne's evaporator coils were manufactured from materials that were not suitable for their intended purpose, as they were not capable of handling R-410A refrigerant, which works at a higher operating pressure than its predecessor, R-22. As a result, the coils prematurely failed, causing refrigerant to leak and preventing the HVAC system from generating cool air, which is its primary function.

26.     By failing to disclose that Nordyne HVAC systems contained defective evaporator coils that caused premature failure of the units, Nordyne engaged in unconscionable, deceptive and unfair business practices, causing damages to Plaintiffs and Class Members, who reasonably expected that Nordyne's HVAC systems would not be defective and would function as intended.

27.     In addition, Nordyne's distribution of its HVAC systems without disclosing the defective evaporator coils and labor and refrigerant costs that would be incurred, constitutes an unconscionable, deceptive and unfair business practice because Plaintiffs and Class Members reasonably expected their units to be reliable and of high quality.  Instead, the HVAC systems failed prematurely as a result of the defectively designed and manufactured evaporator coils, which leaked refrigerant and impaired the HVAC system's ability to deliver cool air to the home. Moreover, the low level of refrigerant can cause additional parts of the HVAC system, like the compressor, to fail, thereby triggering additional problems with the system.

28.     Further, Nordyne engaged in unconscionable, deceptive and unfair business practices by failing to notify Plaintiffs and Class Members of the defectively designed and manufactured evaporator coils, which caused its HVAC systems to prematurely fail, thus causing Plaintiffs and Class Members to incur unnecessary labor costs in connection with the hiring of

HVAC technicians to diagnose why their systems were not working, and costs to replace the defective coils and refrigerant that leaked from the coils.

29.     Nordyne was obligated to fully and properly disclose that its copper evaporator coils were defective and prone to premature failure.   Because of Nordyne's aforementioned conduct, Plaintiffs and Class Members were forced to incur monetary damages to investigate the problem, costs to replace the refrigerant that leaked from the Nordyne units, and labor costs to diagnose and repair their HVAC systems.   Plaintiffs and Class Members would not have purchased HVAC systems manufactured by Nordyne, or would have paid less for them, had they known of the defective evaporator coils.

30.     Plaintiffs and putative Class Members suffered damages as a direct and proximate cause of Nordyne's above-described misconduct.

## PLAINTIFF HARRIS' INDIVIDUAL CLAIMS

31.     In October 2011, Plaintiff Debra Harris purchased two new Broan brand heating and cooling systems for her new home from GreenDog Energy Solutions LLC ("**GreenDog**") – a retailer of residential heating and cooling systems.   One was a 1.5 ton system intended to heat and cool her master bedroom, while the other was a 3.5 ton system intended to cool the main part of Harris' house.   Both systems were manufactured by Defendant Nordyne and contained the defective copper evaporator coils at issue.

32.     Harris paid the retail price of $10,000.00 for the two systems, which included necessary and related ductwork.

33.     On October 19, 2011, GreenDog completed installation of the two systems in Harris' home.

34.     Throughout the summer months of 2012, Harris contacted GreenDog and requested that the retailer inspect the 3.5 ton system, model number FT4BF-060KA, as she suspected it was not operating properly.  Despite the fact that Harris kept the system running constantly (which resulted in exorbitant electric bills), her home was not cooling.   On approximately three occasions, GreenDog determined that the R-410A refrigerant in the coils was low and topped it off.

35.     In July 2013, Harris contacted GreenDog again and requested that the retailer further inspect the 3.5 ton system, as it was still not functioning properly. GreenDog performed an infrared dye test and subsequently determined that the R-410A refrigerant was leaking from holes in the system's copper evaporator coils and preventing the system from generating cool air, which is its primary function.

36.     On October 9, 2013, less than twenty-four (24) months after Harris purchased the system, GreenDog had to install new aluminum evaporator coils in her system and replenish the R-410A refrigerant.

37.     The new aluminum evaporator coils were replaced free-of-charge under Nordyne's express limited warranty.  However, the R-410A refrigerant and labor were not covered under Defendant's five-year limited warranty, causing Harris to pay $280.00 out-of-pocket to GreenDog for the refrigerant and labor necessitated by the defective copper evaporator coils.

38.     Harris would not have purchased an HVAC system manufactured by Defendant, or would have paid less for her HVAC system, had she known about the defective evaporator coils.

## PLAINTIFF STARK'S INDIVIDUAL CLAIMS

39.     Plaintiff Barbara Stark purchased her Florida home in 2010.

40.     On February 1, 2012, Stark purchased a new Frigidaire brand heating and cooling system, model number P5RF-X48K, from Cliff's Air Conditioning & Heating Inc. ("**Cliffs**"), a retailer of residential heating and cooling systems, to replace the HVAC system in her home. The system was manufactured by Defendant Nordyne and featured the defective copper evaporator coils at issue.

41.     On February 1, 2012, Cliff's installed the system in Stark's home. Stark paid $3,950.00 for the system.

42.     In September 2013, a mere nineteen (19) months after Stark purchased the system, she noticed that it was not generating cool air, which is its primary function.  She contacted Cliff's and requested an inspection of her system.

43.     On September 27, 2013, Cliff's inspected the system and determined that the copper evaporator coils within it had failed and that the R-410A refrigerant had leaked through holes within the system's copper evaporator coils, which prevented it from generating cool air.

44.     Stark demanded that Cliff's replace the defective copper evaporator coils with new aluminum coils, as she was not interested in having the defective coils replaced with identical copper coils that would prove to be equally defective in time.  Cliff's informed Stark that the aluminum evaporator coils used in newer heating and cooling systems manufactured by Defendant and others could not be retrofit to her system, as her system only accepts the type of copper evaporator coils that had just failed.  Consequently, Cliff's replaced the failed copper evaporator coils with new, identical copper evaporator coils and replenished the R-410A refrigerant.  As a result, Stark will continue to sustain unnecessary, out-of-pocket losses for labor

11

and refrigerant due to the continued existence of defective evaporator coils in her HVAC system, which will ultimately cause her system to prematurely fail yet again.

45.     The new copper evaporator coils were replaced free-of-charge under Nordyne's limited warranty.   However, the R-410A refrigerant and labor were not covered under the warranty.   Accordingly, Stark had to pay $250.00 out-of-pocket to Cliff's for the replacement refrigerant and labor necessitated by the defective copper evaporator coils.

46.     Stark would not have purchased an HVAC system manufactured by Defendant, or would have paid less for her HVAC system, had she known about the defective evaporator coils.

## CLASS ALLEGATIONS

47.     As detailed in the individual counts below, Plaintiffs bring this class action lawsuit on behalf of themselves and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3).

48.     Plaintiffs seek to represent the following Class:

> All Florida consumers who purchased residential heating and cooling systems manufactured by Nordyne, LLC and featuring copper evaporator coils between May 21, 2010 and the present.

49.     Excluded from the Class are Defendant, its employees, agents and assigns.   Also excluded are any members of the judiciary to whom this case is assigned, their Court staff and Plaintiffs' counsel.

## Numerosity

50.     Class Members are so numerous and geographically dispersed throughout the United States that joinder of all Class Members is impracticable.

51.     While the exact number of Class Members remains unknown at this time, upon information and belief, there are thousands, if not hundreds of thousands, of putative Class Members.

**Predominance of Common Questions of Law and Fact**

52.     This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members.   These common legal and factual questions include, but are not limited to, the following:

a.   whether Defendant is subject to the Florida Deceptive and Unfair Trade Practices Act, § 501.201, *et seq.*, Florida Statutes (hereinafter, "**FDUTPA**");

b.   whether Defendant's conduct violates FDUTPA;

c.   Whether the copper evaporator coils are uniformly defective, causing refrigerant to prematurely leak from Defendant's HVAC systems;

d.   Whether Defendant knew or should have known of the defective copper evaporator coils;

e.   Whether Defendant omitted or concealed material facts from consumers about the defective copper evaporator coils;

f.   Whether Defendant should have replaced the defective copper evaporator coils with aluminum coils before distributing and selling the HVAC systems at issue in the stream of commerce;

g.   Whether there is a common way to resolve the problem with Defendant's defective copper evaporator coils;

h.  whether Defendant has been unjustly enriched by the conduct alleged herein;

i.  whether Plaintiffs and Class Members have sustained damages and the proper measure of their losses;

j.  whether Plaintiffs and Class Members are entitled to declaratory relief and/or injunctive relief; and

k.  whether Plaintiffs and Class Members are entitled to other appropriate remedies.

### Typicality

53.   Plaintiffs' claims are typical of the claims of the proposed Class Members, because, *inter alia*, all Class Members were damaged as a result of Defendant's uniform misconduct, as described above, and were subject to Defendant's false, deceptive and/or misleading trade practices in connection with the manufacturing, distribution and sale of HVAC systems containing defective copper evaporator coils.

54.   Plaintiffs share the aforementioned facts and legal claims and/or questions with all Class Members.   There is a sufficient relationship between Defendant's conduct and the damages sustained by Plaintiffs and Class Members.

### Adequacy

55.   Plaintiffs will fairly and adequately protect the interests of Class Members and are committed to the vigorous prosecution of this action.   Plaintiffs have retained counsel experienced in complex consumer class action litigation, and intend to prosecute this action vigorously.  Plaintiffs have no adverse or antagonistic interests to those of the Class.

## Superiority

56.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.   Individual joinder of all Class Members' claims is impracticable or impossible for at least the following reasons:

   a.  The claims presented in this case predominate over any questions of law or fact, if any exist at all, affecting individual Class Members;

   b.  Absent a Class, the Class Members will continue to suffer damage and Defendant's violations of FDUTPA will continue without remedy;

   c.  Given the size of individual Class Members' claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendant committed and continues to commit against them, and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

   d.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts, while also increasing the delay and expense to all parties and the Court. Comparatively, the class action device provides economies of scale and allows Class Members' claims to be comprehensively administered and uniformly adjudicated in a single proceeding;

   e.  When the liability of Defendant has been adjudicated, claims of all Class Members can be administered efficiently and/or determined uniformly by the Court;

f.   This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiffs and Class Members can seek redress for the harm caused to them by Defendant;

g.   The trial and litigation of Plaintiffs' claims are manageable;

h.   Defendant has acted and/or refused to act on grounds generally applicable to the Class by engaging in a uniform practice of manufacturing, distributing and selling HVAC systems that contain defective copper evaporator coils, and failing to remedy the problem or notify consumers of the defect, thereby making appropriate final injunctive relief with respect to the Class as a whole; and

Because Plaintiffs seek injunctive relief and corresponding declaratory and equitable relief for the entire Class, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. Further, bringing individual claims would burden the Courts and be an inefficient method of resolving the dispute at the center of this litigation. Adjudications with respect to individual Class Members would, as a practical matter, be dispositive of the interest of other Class Members who are not parties to the adjudication and may impair or impede their ability to protect their interests.  As a consequence, class treatment is a superior method for adjudication of the issues in this case.

## COUNT I
## VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, § 501.201, *et seq*., Florida Statutes

57.     Plaintiffs restate and reallege paragraphs 1 through 56 as if fully set forth herein.

58.     Plaintiffs assert this cause of action on behalf of themselves and the putative Class.

59.     Plaintiffs and Class Members are "consumers" as defined by Florida Statute §501.203(7), and the subject transactions are "trade or commerce" as defined by Florida Statute §501.203(8).

60.     Defendant Nordyne manufactures, distributes and sells HVAC systems, which contain, *inter alia*, copper evaporator coils.  The HVAC systems are "goods" within the meaning of FDUTPA.

61.     FDUPTA was enacted to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

62.     For the reasons discussed herein, Defendant Nordyne violated and continues to violate FDUPTA by engaging in the herein described unconscionable, deceptive, unfair acts or practices proscribed by Florida Statute §501.201, *et seq*.  Defendant Nordyne's affirmative misrepresentations, omissions and practices described herein were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

63.     Defendant Nordyne's actions constitute unconscionable, deceptive, or unfair acts or practices.  Defendant Nordyne misrepresented and omitted material facts regarding the copper evaporator coils contained within their HVAC systems by failing to disclose known defects, and

17

engaging in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers, in violation of FDUTPA.

64.     Specifically, Defendant Nordyne engaged in the following deceptive and misleading conduct in violation of FDUTPA:

a.  Defendant Nordyne manufactured, distributed and sold HVAC systems that it knew contained materially defective copper evaporator coils that would fail prematurely under normal use.  Nordyne failed to disclose adverse material facts to Plaintiffs and putative Class Members concerning its defective copper evaporator coils, their inherent likelihood of premature failure, the likelihood of formicary corrosion, leaking of refrigerant, and ultimately, coil and HVAC system failure.  These defects interfered with Plaintiffs and putative Class Members' reasonable expectations concerning the performance of the HVAC systems manufactured by Defendant, and caused injury to Plaintiffs and putative Class Members.

b.  Nordyne knew the defect within the copper evaporator coils were unknown to and would not be easily discovered by Plaintiffs and putative Class Members and would defeat their ordinary, foreseeable and reasonable expectations concerning the performance of its HVAC systems.

c.  Nordyne failed to notify Plaintiffs and putative Class Members that repairs of its HVAC systems and/or copper evaporator coils were necessary, and that a failure to repair the defective coils would cause Plaintiffs and

putative Class Members to sustain actual damages, including out-of-pocket costs for replacing refrigerant and labor for repairing or replacing the defective coils.  Plaintiffs and putative Class Members were forced to incur costs associated with hiring HVAC technicians to diagnose the problem with their HVAC systems because of Nordyne's failure to notify them of the defective evaporator coils.  Plaintiffs and putative Class Members also had to pay for the labor associated with the repair or replacement of the defective evaporator coils and replacement refrigerant after the original refrigerant leaked from cracks and holes in the defective coils.

65.    Plaintiffs and putative Class Members suffered damages when they purchased HVAC systems manufactured by Nordyne, which contained defective copper evaporator coils. Nordyne's unconscionable, deceptive and/or unfair practice caused actual damages to Plaintiffs and putative Class Members who were unaware of the defect in the copper evaporator coils when they purchased HVAC systems manufactured by Nordyne.

66.    Nordyne's practices regarding the defective evaporator coils were likely to deceive, and did deceive, consumers acting reasonably under the circumstances.  Consumers, including Plaintiffs and putative Class Members, would not have purchased HVAC systems manufactured by Nordyne, or would have paid less for them, had they known that the systems contained defective copper evaporator coils.

67.    As a direct and proximate result of Nordyne's unconscionable, unfair, and deceptive acts or practices alleged herein, Plaintiffs and putative Class Members have incurred

unreasonable expenses for replacement refrigerant and associated labor costs that are not consistent with expenses normally incurred in maintaining HVAC systems.

68.     As a direct and proximate result of the unconscionable, unfair, and deceptive acts or practices alleged herein, Plaintiffs and putative Class Members have been damaged and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial.   In addition, Plaintiffs and the putative Class seek equitable relief, injunctive relief against Nordyne on terms that the Court considers reasonable, and reasonable attorneys' fees.

69.     Plaintiffs and the putative Class reserve the right to allege other violations of FDUPTA as Nordyne's conduct is ongoing.

## COUNT II
## UNJUST ENRICHMENT

70.     Plaintiffs restate and reallege paragraphs 1 through 56 as if fully set forth herein.

71.     Plaintiffs assert this cause of action on behalf of themselves and the putative Class.

72.     Plaintiffs and putative Class Members conferred a benefit on Nordyne when they purchased HVAC systems manufactured by Nordyne.

73.     Nordyne has been unjustly enriched in retaining revenues derived from Plaintiffs and putative Class Members' purchase of HVAC systems, the retention of which is unjust and inequitable because the HVAC systems contained copper evaporator coils that were defective in design or manufacture, were not fit for their ordinary and intended use, and did not perform in accordance with the reasonable expectations of ordinary consumers.

74.     Plaintiffs and putative Class Members have suffered a loss of money as a result of Nordyne's unjust enrichment because they would not have purchased their HVAC systems on

the same terms or for the same price, had they known of the defects in the copper evaporator coils. Plaintiffs and putative Class Members paid for the HVAC systems on the condition that they would be free from defects and the HVAC systems, and copper evaporator coils contained therein, did not perform as promised.

75.     Nordyne knew, or should have known, of the defects alleged herein. Nonetheless, Nordyne failed to inform consumers of the defect while it continued collecting the proceeds of full price sales of its defective HVAC systems.

76.     Nordyne has profited from its unlawful, unfair, misleading and deceptive practices at the expense of Plaintiffs and Class Members, under circumstances in which it would be unjust for Defendant to be permitted to retain the benefit.

77.     Plaintiff and Class Members are entitled to restitution of, disgorgement of, and/or imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Nordyne for its unlawful conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and putative Class Members, pray for a judgment:

   a.   Determining that this action is a proper class action and certifying the Class, as defined herein;

   b.   Appointing Plaintiffs Harris and Stark as Class Representatives;

   c.   Appointing the undersigned as Class Counsel;

   d.   Enjoining Defendant from continuing to violated FDUTPA;

   e.   Finding Defendant liable to Plaintiffs and Class Members for actual damages in such amount(s) as the Court or Jury may determine;

21

    f.   Awarding statutory damages as appropriate;

    g.   Awarding pre- and post-judgment interest;

    h.   Awarding Plaintiffs and Class Members attorneys' fees and all litigation costs;

    i.   Awarding Plaintiffs and Class Members such other relief as may be just and proper.

    j.   Awarding compensatory damages against Nordyne in favor of Plaintiffs and the Class for damages sustained as a result of Nordyne's wrongdoing; and

    k.   Awarding such other and further relief as may be just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a trial by jury on all issues so triable.


Dated: May 21, 2014                    Respectfully submitted,

**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**

*/s/ Jonathan B. Cohen*
Jonathan B. Cohen (Bar No. 0027620)
Rachel Soffin (Bar No. 0018054)
J. Andrew Meyer (Bar No. 0056766)
201 N. Franklin St., 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505
Facsimile: (813) 222-2434
jcohen@forthepeople.com
rsoffin@forthepeople.com

*Attorneys for Plaintiffs*