**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:14-cv-21884-BLOOM/Valle**

DEBRA HARRIS and BARBARA
STARK, on behalf of themselves and all
others similarly situated,

            Plaintiffs,

v.

NORTEK GLOBAL HVAC, LLC

            Defendant.

**DEFENDANT'S OPPOSITION TO**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

FACTUAL BACKGROUND...................................................................................3

I.        Copper Is A State Of The Art Material For Coil Fabrication And Does Not Render NGHL's Evaporator Coils Defective ........................................................3

II.       There Are Significant Differences In The Evaporator Coils Manufactured By NGHL That Impact The Development Of Formicary Corrosion....................6

III.     Coils Fail For Many Reasons Unrelated To Formicary Corrosion........................7

IV.    Formicary Corrosion, Which Can Only Be Diagnosed Through Metallurgical Examination, Does Not Cause The Vast Majority Of Coil Leaks ................................................................................................8

V.       The Majority of Warranty Claims Are Not Representative of Coil Leaks ..........11

VI.    NGHL Repeatedly Disclosed The Perceived Risk Of Formicary Corrosion Through Its Available Means Of Communication ...............................12

VII.   A Disclosure Regarding Formicary Corrosion Would Not Cause Many Consumers To Change Their Purchasing Behavior...............................................15

VIII.  The Named Plaintiffs' Circumstances Demonstrate The Individualized Nature Of The Lawsuit................................................................................16

      A.        Ms. Debra Harris ............................................................................16

      B.        Ms. Barbara Stark............................................................................18

LEGAL STANDARD ..........................................................................................20

ARGUMENT ......................................................................................................21

I.        Plaintiffs' Class Is Not Adequately Defined Or Clearly Ascertainable ...............21

II.       Plaintiffs Cannot Establish Commonality Under Rule 23(A) Because There is No Evidence of Any Defect, Let Alone a Uniform Defect....................24

III.     Plaintiffs Cannot Satisfy The Requirements Of Rule 23(B)(3) Because A Host of Fundamental, Individualized Issues Will Predominate the Claims..........25

      A.        Individualized Issues Predominate As to Each of the Elements of The FDUTPA Claim................................................................................26

IV.       Plaintiffs' Rule 23(B)(2) Class Cannot Be Certified Because Injunctive Or Declaratory Relief Is Not The Predominant Relief Sought ................................... 39

V.       Plaintiffs Cannot Circumvent Rule 23(B)(3)'s Predominance Requirement By Seeking The Certification Of An Issues-Only Class ..................................... 39

REQUEST FOR HEARING .................................................................................... 42

CERTIFICATE OF SERVICE ............................................................................... 43

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alexander v. Danek Med., Inc.*,
    37 F. Supp. 2d 1346 (M.D. Fla. 1999) ...............................................................................23

*Benner v. Becton Dickinson Co.*,
    214 F.R.D. 159 (S.D.N.Y. 2003) .....................................................................................25

*Berenguer v. Warner-Lambert Co.*,
    2003 WL 24299241 (Fla. Cir. Ct. July 31, 2003) .............................................................27

*Breakstone v. Caterpillar, Inc.*,
    2010 WL 2164440 (S.D. Fla. May 26, 2010) ...............................................................21, 32

*Clear Marine Ventures, Ltd. v. Brunswick Corp.*,
    2010 WL 528477 (S.D. Fla. Feb. 11, 2010) .....................................................................34

*Cohen v. Implant Innovations, Inc.*,
    259 F.R.D. 617 (S.D. Fla. 2008) ..........................................................................28, 29, 32

*Collins v. DaimlerChrysler Corp.*,
    894 So. 2d 988 (Fla. Dist. Ct. App. 2004)........................................................................22

*Cooper v. Southern Co.*,
    390 F. 3d 695 (11th Cir. 2004) .......................................................................................26

*Cramer v. Ford Motor Co., Inc.*,
    2011 WL 2477232 (Fla. Cir. Ct. June 9, 2011) ...............................................................24

*Davis v. Powertel, Inc.*,
    776 So. 2d 971 (Fla. Dist. Ct. App. 2000)........................................................................22

*Democratic Republic of the Congo v. Air Capital Grp., LLC*,
    614 F. App'x 460 (11th Cir. 2015) ...................................................................................33

*Helmer v. Goodyear Tire & Rubber Co.*,
    2014 WL 1133299 (D. Colo. Mar. 21, 2014) ...................................................................25

*Jones v. Jeld-Wen, Inc.*,
    250 F.R.D 685 (S.D. Fla. 2008).......................................................................................31

*Karhu v. Vital Pharms., Inc.*,
    2015 WL 3560722 (11th Cir. June 9, 2015)................................................................22, 23

WE L:\95491175\8\65859.0025

*Kia Motors Am. Corp. v. Butler*,
   985 So. 2d 1133 (Fla. Dist. Ct. App. 2008) .................................................................*passim*

*Kottaras v. Whole Foods Market*,
   281 F.R.D. 16 (S.D. Fla. 2012) .....................................................................................37

*Kunzelmann v. Wells Fargo Bank, N.A.*,
   2013 WL 139913 (S.D. Fla. Jan. 10, 2013) ....................................................................38

*Little v. T-Mobile USA, Inc.*,
   691 F.3d 1302 (11th Cir. 2012)......................................................................................20

*Miami Auto. Retail, Inc. v. Baldwin*,
   97 So. 3d 846 (Fla. Dist. Ct. App. 2012)..................................................................27, 30

*Miles v. Am. Online, Inc.*,
   202 F.R.D. 297 (M.D. Fla. 2001)...................................................................................22

*Montgomery v. New Piper Aircraft, Inc.*,
   209 F.R.D. 221 (S.D. Fla. 2001) ........................................................................27, 32, 34

*In re Motions to Certify Classes Against Court Reporting Firms for Charges Relating to Word*
   *Indices* ("*In re Motions to Certify*"), 715 F. Supp. 2d 1265 (S.D. Fla. 2010), ................26, 38

*Murray v. Auslander*,
   244 F.3d 807 (11th Cir. 2001) ........................................................................................39

*O'Neill v. Home Depot U.S.A., Inc.*,
   243 F.R.D. 469 (S.D. Fla. 2006) ...............................................................................28, 40

*Perez v. Metabolife Int'l*,
   218 F.R.D. 262 (S.D. Fla. 2003) ....................................................................................40

*Pop's Pancakes, Inc. v. NuCO2, Inc.*,
   251 F.R.D. 677 (S.D. Fla. 2008) ........................................................................26, 27, 28, 29

*Prohias v. Pfizer*,
   485 F. Supp. 2d 1329 (S.D. Fla. 2007)......................................................................30, 37

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   725 F.3d 244 (D.C. Cir. 2013).......................................................................................36

*Rollins, Inc. v. Butland*,
   951 So. 2d 860 (Fla. Dist. Ct. App. 2006) ......................................................32, 33, 34, 37

*Rosen v. J.M. Auto Inc.*,
   270 F.R.D. 675 (S.D. Fla. 2009) ....................................................................................22

iv

*In re Scotts EZ Seed Litig.*,
    304 F.R.D. 397 (S.D.N.Y. 2015) ...................................................31

*Terrill v. Electrolux Home Prods., Inc.*,
    295 F.R.D. 671 (S.D. Ga. 2013) ..................................................25

*Veal v. Crown Auto Dealerships, Inc.*,
    236 F.R.D. 572 (M.D. Fla. 2006).................................................22

*Vega v. T-Mobile USA, Inc.*,
    564 F.3d 1256 (11th Cir. 2009)................................... 20, 26, 38, 39

*Virgilio v. Ryland Group, Inc.*,
    680 F.3d 1329 (11th Cir. 2012)....................................................26

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S.Ct. 2541 (2011) ..................................................... 20, 24, 39

*Walewski v. Zenimax Media, Inc.*,
    502 F. App'x 857 (11th Cir. 2012) ...............................................21

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
    722 F.3d 838 (6th Cir. 2013) ......................................................25

**Other Authorities**

ACHR News, "Contractors Vent about HVAC Scams"
    http://www.achrnews.com/articles/129282-contractors-vent-about-hvac-scams; .................11

Fed. R. Civ. P. 23(a)(1)-(4) .............................................................20

Fed. R. Civ. P. 23(a)(2) ..................................................................24

Fed. R. Civ. P. 23(b)(2)..................................................................20

Fed. R. Civ. P. 23(b)(3)..................................................................20

Local Rule 7.1(b)(2)......................................................................41

Today Show, "Rossen Reports" http://www.today.com/id/48080346/ns/today-
    today_news/t/rossen-reports-are-air-conditioning-repairers-being-competent-
    honest/#.VjvRMKMo7c .........................................................11

WE L:\95491175\8\65859.0025

## PRELIMINARY STATEMENT

Nortek Global HVAC LLC ("NGHL") manufactures heating, ventilation, and air conditioning ("HVAC") units.  HVAC units contain an evaporator coil, the purpose of which is to absorb heat from the indoor air that passes over it.  Copper has been, and continues to remain, a state of the art material for the fabrication of evaporator coils due to its numerous favorable properties.  However, in the last few years, nearly every leading HVAC manufacturer has been the subject of putative class action lawsuits alleging that copper is a defective material for coil fabrication because of its susceptibility to developing a form of corrosion known as formicary corrosion.  In this case, Plaintiffs bring claims under Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") and for unjust enrichment, which are predicated on NGHL's alleged failure to disclose the purported defect in its copper evaporator coils.  Plaintiffs seek to bring these claims on behalf of a very broadly defined class of "All Florida consumers who purchased residential heating and cooling systems manufactured by [NGHL] that include copper evaporator coils between May 21, 2010 and the present."  Plaintiffs' First Amended Complaint [ECF No. 36] ("Amended Complaint" or "Am. Compl.") ¶ 49; *see also* Plaintiffs' Memorandum of Law in Support of Motion for Class Certification [ECF No. 84] ("Motion" or "Mot.") at 1.[1]

Plaintiffs face fundamental legal and factual barriers to obtaining certification of their proposed class.  Indeed, given the nature of their claims and a variety of crucial facts that have been developed in this case, the putative class fails nearly every element of Federal Rule of Civil Procedure ("Rule") 23.  *First*, the class is not adequately defined under Eleventh Circuit law because the vast majority of putative class members have never experienced a coil failure, let alone the alleged defect of formicary corrosion.  These consumers have not suffered any losses under well-established law and therefore cannot comprise an adequately defined class.  This flaw cannot be remedied because a properly defined class would require mini-trials for every single consumer in order to ascertain whether they experienced a coil failure as a result of formicary corrosion.

---

[1] A putative class action premised on virtually identical allegations has been filed in the Middle District of Tennessee, *Bauer et al. v. Nortek Global HVAC LLC et. al*, No. 3:14-cv-01940.  That case alleges five different putative classes:  a nationwide class; a Tennessee class; a Georgia class; a Texas class; and a Florida class.  The Florida class in *Bauer* also asserts causes of action for FDUTPA and unjust enrichment, and includes all Florida homeowners who purchased an NGHL HVAC unit since January 2007.  Currently, a motion to dismiss and motions to strike the nationwide and state class allegations are pending in that matter.

*Second*, Plaintiffs cannot establish commonality.   All of their purported common questions are premised on the existence of a uniform defect.  But Plaintiffs have not presented a scintilla of evidence as to the existence of any defect.  Their own expert testified that copper is not a defective material for coil fabrication – despite its susceptibility to formicary corrosion – and that he does not know of any defect in the design or manufacture of NGHL's evaporator coils.  Moreover, the class definition includes every single evaporator coil model manufactured by NGHL during the class period, amongst which are material differences that impact the propagation and risk of formicary corrosion.  Thus, Plaintiffs cannot prove any defect of the copper coils through common evidence, which eviscerates all of the alleged common questions.

*Third*, individual issues will predominate as to virtually every aspect of Plaintiffs' claims.  There is no classwide evidence of a deceptive act because the information and materials surrounding the sale of an HVAC unit are highly variable.  For instance, NGHL made numerous disclosures during the class period regarding formicary corrosion and many putative class members knew or should have known of these disclosures.  Other putative class members, including the Plaintiffs, were never provided and never viewed any materials whatsoever in which a disclosure could have been made.  As such, common evidence cannot demonstrate that the same omission occurred as to each putative class member.  There is also no classwide evidence of causation because, as NGHL's consumer survey demonstrates, whether a disclosure regarding formicary corrosion would cause a reasonable consumer to change their purchasing behavior cannot be determined on a uniform basis.  In addition, a highly individualized inquiry is necessary to determine which consumers experienced a coil failure caused by the alleged defect of formicary corrosion.  Finally, there is no classwide evidence of damages.  The damages model set forth by Plaintiffs' expert is tied to the repair costs of an evaporator coil, which is not an allowable measure of damages under FDUTPA.  It is also entirely divorced from NGHL's failure to disclose, the legal theory of liability in this case.  And, most importantly, there is absolutely no data to substantiate any of the inputs needed to effectuate the proposed model.  As such, Plaintiffs have not set forth a viable model for quantifying classwide damages, let alone one that is capable of measurement.

Plaintiffs' requests to certify a Rule 23(b)(2) and Rule 23(c)(4) class must also fail.  Here, injunctive or declaratory relief is not the predominant relief sought and thus a Rule 23(b)(2) class is plainly inappropriate under Eleventh Circuit law.   A Rule 23(c)(4) class is equally

inappropriate given that the case as a whole fails to meet the predominance requirements of Rule 23(b)(3), which cannot be circumvented through the certification of an issues-only class. Accordingly, Plaintiffs' request for class certification should be denied.

FACTUAL BACKGROUND

**I.      Copper Is A State Of The Art Material For Coil Fabrication And Does Not Render NGHL's Evaporator Coils Defective**

NGHL is a longstanding manufacturer of residential HVAC units, which are marketed under various brand names such as Maytag, NuTone, Broan, and Frigidaire. For decades, NGHL – like nearly all HVAC manufacturers – used copper tubing in the fabrication of its evaporator coils because of its many favorable properties. As Plaintiffs' liability expert Mr. Paul Sikorsky explained, copper has excellent heat transfer characteristics, it provides ease of forming, and it offers good material strength. November 10, 2015 Deposition of Paul Sikorsky ("Sikorsky Dep.") (Exhibit ("Ex.") 1) at 48:16-21; 49:5-7; 49:22-24. Copper also provides good levels of corrosion resistance and can survive many years without a trace of corrosion damage in many typical HVAC residential environments. *Id.* at 49:25-50:20. In fact, as Mr. Sikorsky explained, copper specifically protects itself from corrosion by the development of a copper oxide surface layer which is resistant to corrosion. *Id.* at 50:22-51:5.

While copper provides very good corrosion resistance, like nearly all metals it is not impervious to corrosion. Formicary corrosion – which can only form in the presence of moisture, oxygen, organic acid, and copper – is a type of corrosion that can develop on the copper tubing of an evaporator coil. October 24, 2015 Declaration of Dr. Noah Budiansky ("Budiansky Decl.") (Ex. 2) at 6. Here, Plaintiffs' lawsuit is premised on the allegation that NGHL's evaporator coils are defective because they are made of copper and are therefore "susceptib[le] to formicary corrosion." Am. Compl. at ¶ 19; *see also* Mot. at 7.[2] However, the *only* evidence Plaintiffs rely upon as support that this constitutes a defect are documents in which NGHL employees communicate their perception that formicary corrosion is the number one cause of evaporator coil leaks. *See* Mot. at 6-9. As discussed in Section IV (pp. 9-11) *infra*,

---

[2] While Plaintiffs also broadly contend that an "evaporator coil that leaks refrigerant is defective," Mot. at 5, that contention is both misleading and irrelevant. Mr. Sikorsky plainly stated that a leaking evaporator coil is defective only "in that it prevents the system from operating properly" and that it is not necessarily defective as a result of any manufacturing or design defect. Sikorsky Dep. at 54:16-55:10 (Ex. 1).

3

there is no scientific testing or data that corroborates these statements, and in fact, the documents themselves demonstrate that this perception was based on longstanding misunderstandings and misconceptions regarding the nature of formicary corrosion.  Regardless, even if the statements were accurate (they are not), the testimony of Plaintiffs' only liability expert affirmatively establishes that they do not constitute evidence of a defect in NGHL's evaporator coils.

Mr. Sikorsky testified that the use of copper in evaporator coil tubing is *not* a defect in the design or manufacture of the coil.  He also testified that copper's susceptibility to formicary corrosion does not render copper a defective material for coil fabrication:

> Q.    So you would agree that the use of copper in evaporator coil tubing is not by itself a defect in the design or manufacture of the coil?
> …
> THE WITNESS: Yes, I would agree to that.
> …
> Q. And copper coils were not considered to be defective for all these decades because of their susceptibility to formicary corrosion, correct?
> A. Correct.

Sikorsky Dep. at 52:5-9; 121:24-122:2 (Ex. 1).

Mr. Sikorsky further agreed the copper has been and continues to be a "state of the art" material for coil fabrication in residential HVAC applications, so long as the copper is joined properly and is not exposed to materials in the course of manufacture that would cause it to deteriorate.  *Id.* at 46:2-47:23.  And, most critically, Mr. Sikorsky testified that he does not know of *anything* specific to NGHL's manufacturing or design process during the class period – including any materials used in the course of manufacture – that renders NGHL's copper evaporator coils defective:

> Q.  …You are not offering any opinion that you know of anything specific to Nortek's manufacturing or design process that renders its copper defective, correct?.... During the class period.
> A.  Correct.
> …
> Q.  Do you know of anything specific to Nortek's copper evaporator coils that were manufactured during the class period that render the manufacturing or design of their coils defective?
> A.  Correct.
> Q. Correct you don't know of anything?
> A.  I don't know of anything specific.
> …

> Q. But you have not offered any opinion as to any specific chemicals used by Nortek since 2010 of which you are aware that could have caused or contributed to formicary corrosion?
> A. That is correct.

*Id.* at 53:12-18; 54:8-15; 152:10-14.  Mr. Sikorsky gave this testimony despite citing the NGHL documents in question both at his deposition and in his report.  *Id.* at 116:4-117:20; October 23, 2015 Declaration of Paul J. Sikorsky ("Sikorsky Decl.") (Ex. 3) at ¶¶ 21-22.  Thus, Plaintiffs' repeated reference to and reliance upon these uncorroborated NGHL documents is a red-herring and does not provide any relevant evidence of the existence of a defect in this case.

Plaintiffs also contend that NGHL took too long to transition to aluminum, suggesting that aluminum is a superior material to copper because it is not susceptible to formicary corrosion.  Mot. at 10.  But they cite no facts or studies to support that contention.  First, while Plaintiffs refer to "competitors" who began this transition before NGHL (implying there are multiple competitors), *id.*, Mr. Sikorsky testified that the *only* competitor he knows of in this regard is Trane.  Sikorsky Dep. at 172:6-14 (Ex. 1).

More importantly, Mr. Sikorsky explained that aluminum coils can fail for a variety of reasons and are susceptible to all forms of corrosion other than formicary corrosion.  *Id.* at 51:6-8.  In fact, he testified that there are "certainly" environments where aluminum is more susceptible to corrosion than copper, including a residential application near a marine environment (*i.e.*, a common environment found in Florida).  *Id.* at 166:23-25; 51:13-52:4.  Thus, Mr. Sikorsky agreed that taking into account all of the factors that impact a coil in application, aluminum is not a better material for coil fabrication than copper.  *Id.* at 208:2-8.

---

[3] Plaintiffs also reference NGHL's knowledge that Goodman and Rheem were transitioning to aluminum, but contrary to Plaintiffs' suggestion, Mr. Lattanzi never stated that these competitors began their transition before NGHL.  October 6, 2015 Deposition of Matthew Henry Lattanzi ("Lattanzi Oct. 6 Dep.") (Ex. 4) at 78:12-80:20.  (Ex. 1).

5

## II.      There Are Significant Differences In The Evaporator Coils Manufactured By NGHL That Impact The Development Of Formicary Corrosion

Contrary to the facts and evidence submitted in this case, Plaintiffs wrongfully suggest that all of NGHL's evaporator coils share "identical components and evaporator coils."  Mot. at 3.[4]  There are, however, many critical differences in the design and manufacture of the different types of copper evaporator coils manufactured by NGHL, differences which impact the propagation and risk of formicary corrosion.  ███████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████  see also November 6, 2015 Rebuttal Declaration of Dave Dorste ("Dorste Rebuttal Decl.") (Ex. 5) at ¶ 2.  These differences are important because, as NGHL's HVAC design expert explained, "the form that the coil takes and what shape it is and how it's located in the product and how the air flows over it can affect how moisture will stay on the coil or how moisture will run off the coil… All those are factors in consideration of how something like formicary corrosion might propagate."  November 17, 2015 Deposition of David C. Dorste ("Dorste Dep.") (Ex. 6) at 62:4-25.

Beyond this, in 2010, NGHL began transitioning to a copper evaporator coil made with a zinc and tin alloy known as Luvata Anteater coils ("Luvata Coils").  This transition continued through 2011 and 2012, in conjunction with the introduction of all-aluminum microchannel coils. January 27, 2015 Defendant Nordyne, LLC's Objections and Answers to Plaintiffs' First Set of Interrogatories ("NGHL Answers") (Ex. 7), Answer No. 5.  By mid-2013, NGHL no longer sold any HVAC units containing standard copper evaporator coils.  November 6, 2015 Defendant Nortek Global HVAC LLC's Supplemental Objections and Answers to Plaintiffs' First Set of Interrogatories ("NGHL Supplemental Answers") (Ex. 8), Answer No. 5.  The alloy in Luvata Coils renders them fifty-times more resistant to formicary corrosion than standard copper evaporator coils.  October 23, 2015 Declaration of Dave Dorste ("Dorste Decl.") (Ex. 9) at ¶ 29. While Plaintiffs vaguely contend that Luvata Coils have "also been the subject of complaints and

---

[4] Although Plaintiffs cite Mr. Lattanzi's testimony in support of this contention, Mr. Lattanzi stated no such thing.  Rather, Mr. Lattanzi indicated only that the evaporator coil in particular ████████████████████████████████████████████████████████████ ██████████████████████████████ █ ████████████████████████████████ ████████████████████████████ █ ██████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████

warranty claims for alleged leaks," Mot. at 10, that position is irrelevant to this litigation because the alleged complaints to which they cite are not based upon the existence of formicary corrosion. *See* Sikorsky Dep. at 154:11-17 (Ex. 1) (testifying about the nature of these documents). Indeed, there are no Luvata Coils that have ever been proven to leak as a result of formicary corrosion. Lattanzi Oct. 6 Dep. at 22:21-24:2 (Ex. 4); Sikorsky Dep. at 156:10-20 (Ex. 1). ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████

## III.    Coils Fail For Many Reasons Unrelated To Formicary Corrosion

It is undisputed that coils can fail for numerous reasons unrelated to formicary corrosion, or any defect in the design or manufacture of the coil. Sikorsky Dep. at 55:12-19; 64:2-18; 69:10-70:9 (Ex. 1). Firstly, there are various modes of coil failure, only one of which is a leakage of refrigerant. November 24, 2015 Deposition of Robert Baker ("Baker Dep.") (Ex. 11) at 89:22-102:2 (describing several modes of coil failure). In addition, when the mode of failure is a refrigerant leak, there are many potential sources for such a leak. One of the most common causes of evaporator coil leaks is technician error during installation. October 23, 2015 Declaration of Robert Baker ("Baker Decl.") (Ex. 12) at ¶ 27-29; *see also* Sikorsky Dep. at 57:5-12; 69:23-70:4 (Ex. 1); September 1, 2015 Deposition of Jeffrey A. Eisaman ("Eisaman Dep.") (Ex. 13) at 53:12-55:13; September 3, 2015 Deposition of John S. Saccone ("Saccone Dep.") (Ex. 14) at 91:10-93:13. Technicians can also inadvertently create leaks when servicing another part of the HVAC system. Sikorsky Dep. at 59:2-7 (Ex. 1). Evaporator coil leaks can also be caused by improper or inadequate maintenance practices. Baker Decl. at ¶ 28 (Ex. 12); *see also* Sikorsky Dep. at 60:3-61:3 (Ex. 1); Eisaman Dep. at 55:14-56:12 (Ex. 13); Saccone Dep. at 96:15-97:19 (Ex. 14). A common problem is the use of cleaners that are not formulated, intended, or approved for use in HVAC systems, including "home mixtures" such as vinegar, which can cause copper to corrode if placed on or near the evaporator coil. Baker Decl. at ¶ 28(b) (Ex. 12); *see also* Sikorsky Dep. at 61:5-12 (Ex. 1).

Contaminants in the environment can also lead to coil leaks as a result of various corrosive processes. Sikorsky Dep. at 64:2-4 (Ex. 1); *see also* Baker Decl. at ¶ 31 (Ex. 12). For

instance, coils can experience corrosion (particularly pitting corrosion) as a result of the excessive sulfur compounds emitted by drywall imported from China.  Sikorsky Dep. at 64:9-18 (Ex. 1); *see also* Baker Decl. at ¶ 31 (Ex. 12); Budiansky Decl. at 4-5; 7 (Ex. 2).  This phenomenon – which results in a corrosion process that is distinct from formicary corrosion – has been widely documented by federal and state agencies, including the Florida Department of Health.  Baker Decl. at ¶ 31 (Ex. 12); December 2, 2015 Deposition of Noah Budiansky ("Budiansky Dep.") (Ex. 15) at 105:25-106:3 (describing formicary corrosion's "distinctive morphology"); Sikorsky Dep. at 128:17-20 (Ex. 1).  Because Chinese drywall was installed in many homes around the country in the mid-to-late 2000s, particularly in Florida, Mr. Sikorsky admits that it is possible this could explain some of the reported increase in evaporator coil leaks during this time period.  Sikorsky Dep. at 67:19-68:9 (Ex. 1); *see also* Baker Decl. at ¶ 31 (Ex. 12).  There are also many other modes of corrosion that can potentially impact an evaporator coil, such as corrosion resulting from high concentrations of salt in the air, which is typical of marine environments.  Sikorsky Dep. at 106:20-108:7; 51:9-52:4 (Ex. 1).



## IV.   Formicary Corrosion, Which Can Only Be Diagnosed Through Metallurgical Examination, Does Not Cause The Vast Majority Of Coil Leaks

Formicary corrosion is a very specific type of corrosion that presents with a unique morphology characterized by finger-like tunneling projections, which resemble an "ants nest."

---

[5] ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████ (Ex. 1).  There is also no scientific or published basis for Mr. Sikorsky's *ipse dixit* opinion that a claim rate above 1% is excessive.  *See* Kwon Decl. ¶ 35 (Ex. 16); Sikorsky Dep. at 165:17-23 (Ex. 1).

Budiansky Decl. at 6 (Ex. 2).  As Mr. Sikorsky admits, given the many causes of coil leaks, it is incorrect to assume that any particular leak is due to formicary corrosion.  Sikorsky Dep. at 70:10-15 (Ex. 1).  Indeed, there is no field method for determining if a leak is due to formicary corrosion, nor can formicary corrosion be diagnosed on visual inspection of the coil.  *Id.* at 108:15-109:4; 109:6-13; *see also* Baker Decl. at ¶ 31 (Ex. 12); Budiansky Decl. at 16-17 (Ex. 2).  Rather, as Mr. Sikorsky explicitly states in his declaration, the only way to confirm the existence of formicary corrosion and to differentiate its morphology from other types of corrosion is to employ an individualized testing protocol "for *each* Class Member or Subclass Member" that involves "[m]etallographic examination of the leak to verify the type of corrosion."  Sikorsky Decl. ¶ 35.3 (Ex. 3) (emphasis added); *see also* Sikorsky Dep. at 178:9-19 (Ex. 1); Budiansky Decl. at 17 (Ex. 2).  Notably, Mr. Sikorsky affirmatively proposes that every allegedly failed coil be subjected to a 3-step testing protocol to confirm (a) the occurrence of a leak, (b) the location of the leak, and (c) the existence of formicary corrosion.  Sikorsky Decl. ¶ 35 (Ex. 3).[6]

Formicary corrosion began receiving increased attention in the mid-to-late 2000's.  Baker Decl. at ¶ 32 (Ex. 12).  However, it was not a well-understood process by many at the time and rapidly became a widely-misused generic label – an "urban legend" – for explaining many real or perceived coil leaks.  Baker Dep. at 115:6-19; 147:20-23 (Ex. 11).  The increased attention to formicary corrosion was also occurring at a time when the consequences of Chinese drywall were not well-understood.  Thus, many in the industry (including NGHL) were conflating Chinese-drywall induced corrosion with formicary corrosion.  Lattanzi Oct. 6 Dep. at 91:21-92:12; 215:21-216:20 (Ex. 4); Sikorsky Dep. at 128:10-129:19 (Ex. 1) (agreeing NGHL's representative made a "factual error" in a published article).  These misunderstandings and misperceptions were the genesis for the documents in which NGHL employees stated that formicary corrosion is the number one cause of evaporator coil leaks.  Lattanzi Oct. 6 Dep. at 5:20-7:12; 18:15-19:11 (Ex. 4).  In fact, the documents themselves corroborate the nature and existence of these misperceptions: numerous of the documents, including one prominently cited

---

[6] Even if formicary corrosion is observed on metallurgical examination, it is possible that it: (a) exists on the surface of the coil without penetrating all the way through the coil (and therefore would not act as the source of the leak); (b) exists in combination with other types of corrosion or leak sources (in which case a leak will have occurred regardless of the existence of formicary corrosion); and (c) is a result of organic acids created by external variables unrelated to NGHL's manufacturing or design process (such as unintended or unapproved practices of a homeowner or HVAC technician).  Sikorsky Dep. at 109:18-110:18 (Ex. 1).

in the Motion, clearly indicate that NGHL employees were blaming Chinese drywall for a perceived increase in formicary corrosion.  *See* Mot. at Ex. 8; *see also* Lattanzi Oct. 6 Dep. at 14:10-15:6 (Ex. 4) (discussing this document).[7]

While Mr. Sikorsky opines (and Plaintiffs argue) on the basis of these documents that NGHL "self-identified corrosion (and specifically formicary corrosion) as the primary cause of [coil] failures," Sikorsky Decl. at ¶ 33 (Ex. 3), he concedes he does not know this to be a fact. Sikorsky Dep. at 119:3-8.  (Ex. 1) ("Q. So you don't actually know for a fact that formicary corrosion is the number-one cause of Nortek's evaporator coil leaks?... A: Again, other than them saying it was, no.").  Mr. Sikorsky also admits he does not know how many of NGHL's evaporator coil leaks are caused by formicary corrosion, nor does he know what percentage of NGHL's evaporator coils will ever leak as a result of formicary corrosion. Sikorsky Dep. at 40:4-41:14 (Ex. 1).[8]

Indeed, there is not – and has never been – any *scientific data* establishing that formicary corrosion is the number one cause of NGHL's evaporator coil failures, or that it impacts more than a miniscule percentage of the total evaporator coils manufactured by NGHL.  Lattanzi Oct. 6 Dep. at 15:22-19:11 (Ex. 4); Baker Dep. at 114:21-115:13 (Ex. 11).  Notably,



Moreover, according to a report relied upon by both Plaintiffs and Mr. Sikorsky, *90% of copper tube failures are caused by factors other than*

---

[7] While Plaintiffs also cite NGHL's consumer websites, Mot. at 6-7, the cited webpages were published in 2012 (microchannelfacts.com webpage) and 2013 (nortekhvac.com webpage), and are based on the same misunderstandings and misperceptions as the other NGHL documents. *See* December 18, 2015 Declaration of Matt Lattanzi ("Lattanzi Decl.") (Ex. 17) ¶¶ 2-5.  At the time of Plaintiffs' Motion, neither of the webpages had been materially updated since the year in which they were published, and neither webpage reflected NGHL's evolving knowledge about formicary corrosion. *Id.* ¶¶ 2-5.  As Plaintiffs' damages expert, Mr. Bernatowicz, confirmed, companies can and do make mistakes in statements made to the public.  December 7, 2015 Deposition of Frank A. Bernatowicz ("Bernatowicz Dep.") (Ex. 18) at 296:16-18.  NGHL has since updated these webpages.  Lattanzi Decl. ¶ 3; ¶ 5.

[8] When questioned about the NGHL documents, Mr. Sikorsky testified that (a) he had no idea what the statements are based upon, (b) he did not know whether the statements were confirmed by any scientific evidence, and (c) he did not conduct any scientific testing to confirm the accuracy of the statements.  Sikorsky Dep. at 118:3-119:8 (Ex. 1).

formicary corrosion.  Sikorsky Dep. at 120:10-15 (Ex. 1); *see also* Nordyne-0596830-0596844 (Ex. 19).[9]  While this report is not specific to evaporator coils, it corroborates the fact that the *vast majority* of coil leaks are not caused by formicary corrosion.  That fact is further supported by the failure testing performed by Mr. Noah Budiansky, NGHL's metallurgist.  He tested a random sample of 25 confirmed leaking evaporator coils, which demonstrated a wide variety of causal mechanisms that were unrelated to formicary corrosion.  Of the 25 leaking coils, only *one* exhibited evidence of through-wall formicary corrosion (*i.e.*, capable of causing a coil leak).  Budiansky Decl. at 24 (Ex. 2).

## V.    The Majority of Warranty Claims Are Not Representative of Coil Leaks

It is undisputed that evaporator coil leaks can be easily misdiagnosed.  *See* Sikorsky Dep. at 74:2-5 (Ex. 1).  This often occurs because many HVAC contractors and technicians are not adequately trained and experienced.  Baker Decl. at ¶ 20 (Ex. 12); *see also* October 23, 2015 Declaration of Jane Sidebottom ("Sidebottom Decl.") (Ex. 20) at 14-15.  There is also considerable dishonesty by HVAC contractors in the industry.[10]  Mr. Sikorsky does not disagree.  Sikorsky Dep. at 75:6-76:18 (Ex. 1).  Notably, both of Plaintiffs' contractors confirmed the risk for misdiagnoses as to the existence of a coil leak, citing "inexperience," false positives in the instruments being used, and the fact that "a lot of guys [] are in a hurry."  Eisaman Dep. at 58:12-14 (Ex. 13); Saccone Dep. at 106:1-13, 106:24-107:21 (Ex. 14).  As a result of these issues, warranty claims are routinely filed on evaporator coils that have not actually failed.  *See* Sikorsky Dep. at 76:19-77:1 (Ex. 1).  ███████████████████████

████████████████████████████████████████████

████████████████████████████████████                    Lattanzi Oct. 6

---

[9] This report describes all copper tubes, including those contained in chiller units.  Sikorsky Dep. at 122:3-123:2 (Ex. 1).  As Mr. Sikorsky testified, chiller units are not the same as evaporator coils and are exposed to different environmental contaminants than evaporator coils. *Id.* (Ex. 1). Thus, while the report demonstrates that the vast majority of copper tube failures in general are not caused by formicary corrosion, it does not provide a basis for ascertaining the actual percentage of NGHL's evaporator coil leaks that are caused by formicary corrosion.

[10]    *See*    ACHR    News,    "Contractors    Vent    about    HVAC    Scams" http://www.achrnews.com/articles/129282-contractors-vent-about-hvac-scams;    Today    Show, "Rossen Reports" http://www.today.com/id/48080346/ns/today-today_news/t/rossen-reports-are-air-conditioning-repairers-being-competent-honest/#.VjvRMKMo7c (Composite Exhibit 21).

Dep. at 217:21-218:4 (Ex. 4).   As such, most warranty claims filed on fully functioning evaporator coils remain undetected.

In order to assess the frequency with which evaporator coil warranty claims are representative of actual coil leaks, NGHL engaged Mr. Budiansky to test a statistically significant sample size of copper evaporator coils on which warranty claims were made due to alleged failures.  Mr. Budiansky subjected the coils to an extensive, well-documented, and well-supported leak test, which revealed that *over 66%* of the coils did not exhibit a leak.  Budiansky Decl. at 23 (Ex. 2).  ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████   ██████████████████████████   Thus, the majority of warranty claims on evaporator coils are not representative of coil failures or coil leaks.[11]  While Plaintiffs allege that this position is "wholly unsubstantiated," Mot. at 8, that argument flies in the face of the only scientific testing and analysis that has been conducted on the issue.

## VI.   NGHL Repeatedly Disclosed The Perceived Risk Of Formicary Corrosion Through Its Available Means Of Communication

NGHL does not sell its HVAC products directly to consumers.  Rather, NGHL markets and sells its products to independent HVAC distributors.  Lattanzi Oct. 2 Dep. at 54:22-55:2 (Ex. 10).  These HVAC distributors then market and sell the HVAC products to independent HVAC dealers and contractors.  *Id.* at 55:2-9.  Finally, the HVAC dealers and contractors then sell the HVAC units to the consumer.  *Id.* at 55:9-10.  In some cases, HVAC dealers or contractors sell HVAC units to a developer or builder, who then sells a home containing a new NGHL HVAC unit to the consumer.  *See* Saccone Dep. at 146:5-19 (Ex. 14).  Thus, NGHL is at least two steps – and in some cases, three steps – removed from the ultimate consumer and has no direct communication or interaction with the consumer.  It also has no direct control over the information that is provided to consumers because it does not advertise or market its products directly to consumers (such as through television, online, or print advertising), nor do consumers uniformly see any product packaging in advance of purchase.  Lattanzi Oct. 2 Dep. at 81:1-9; 85:16-86:16 (Ex. 10); July 9, 2015 Deposition of Barbara Stark ("Stark Dep.") (Ex. 22) at 36:10-

---

[11] Mr. Sikorsky's criticisms of Dr. Budiansky's testing methods are scientifically baseless as they are premised on equating helium and refrigerant, which are different in characteristics, size, density – helium being 30 times lighter than refrigerant,.   As Mr. Budiansky explained, "[t]hey're really apples and oranges."  Budiansky Dep. at 140:13-141:5 (Ex. 15).

20; Eisaman Dep. at 33:15-22; 37:16-38:6 (Ex. 13).   Nevertheless, NGHL attempts to communicate with its consumers through materials it provides to its distributors and contractors, and through its consumer website.  Lattanzi Oct. 6 Dep. at 85:16-86:16 (Ex. 4).

Reacting to a perceived rise in formicary corrosion during the late 2000s, and in an effort to be fully transparent with its customers, NGHL made numerous disclosures regarding formicary corrosion through its available means of communication:

- As Plaintiffs concede, in 2008, as soon as NGHL became aware that there was a perceived increase in formicary corrosion, it began discussing the issue with its distributors and contractors.  Lattanzi Oct. 6 Dep. at 7:6-18 (Ex. 4); *see also* Mot. at 8.

- In May 2009, NGHL issued a bulletin to distributors, which was also available to contractors on NGHL's contractor portal, regarding evaporator coil leaks and potential explanations for a perceived increase in such leaks.  Lattanzi Oct. 6 Dep. at 7:19-25 (Ex. 4); *see also* [Nordyne-0582954] (Ex. 23) (distributor and contractor bulletin).[12]

- In September 2010, NGHL conducted an in-depth continuing education course for contractors regarding formicary corrosion.  *See* [Nordyne-0032073] (Ex. 24) (presentation).

- In September 2010, NGHL published a detailed brochure regarding formicary corrosion, which was made available to contractors on NGHL's contractor portal and was intended for dissemination to consumers.  Lattanzi Oct. 6 Dep. at 8:1-5 (Ex. 4); *see also* [Nordyne-0273214-0273215] (Ex. 25) (brochure).

- In October 2011, NGHL published detailed information regarding formicary corrosion on its consumer website, which was followed by several additional online articles regarding the phenomenon.  Lattanzi Oct. 6 Dep. at 8:1-5 (Ex. 4); *see also* Ex. 26 (2011 disclosure); Composite Ex. 27 (subsequent online disclosures).[13]  Collectively, these web pages have received 40,445 hits by 33,873 unique users.  *See* Lattanzi Decl. ¶ 6 (Ex. 17).

Whether – and to what extent – these disclosures were provided to or obtained by consumers is highly variable, particularly in light of the individualized nature of the consumer buying experience.  Sidebottom Decl. at 8-10 (Ex. 20).  NGHL's marketing expert, Jane

---

[12] Nearly all NGHL contractors have access to the materials on the NGHL contractor portal and view these materials regularly.  Sidebottom Decl. at 11 (Ex. 20); Eisaman Dep. at 29:22-30:12 (Ex. 13); Saccone Dep. at 132:13-133:15 (Ex. 14).

[13] Ironically, in seeking to demonstrate the existence of a defect, Plaintiffs cite to and rely upon these consumer website disclosures.  Simply put, Plaintiffs cannot have their cake and eat it too.  If these disclosures are evidence of a defect (they are not according to the testimony of Plaintiffs' liability expert), then they also certainly demonstrate that NGHL repeatedly and overtly disclosed the defect to the public.

Sidebottom, performed a survey of a large sample size of contractors who sell NGHL HVAC products (the "Contractor Survey"), as well as a survey of a large sample size of consumers who had recently purchased an HVAC system (the "Consumer Research Survey"). The results of both of these surveys – along with the testimony of the named Plaintiffs and their contractors – confirmed that the frequency and nature of the research that consumers conduct prior to purchase varies considerably. *See id.* Many consumers, including both named Plaintiffs, purchase an HVAC system without making any effort to obtain any information regarding the system. *Id.* at 8-9. These consumers, for instance, are not provided and do not attempt to view any brochures or websites prior to purchase, including the materials published by the manufacturer. *Id.* at 9-10. Moreover, consistent with the experience of both named Plaintiffs, some consumers have no involvement whatsoever in the selection of their HVAC unit, purchasing whatever unit their contractor selects. *Id.* at 8; *see also* Section VIII (pp.16-19) *infra.*

The testimony of Plaintiff Stark's contractor, Mr. Jeffrey Eisaman, elucidates the experience of these consumers. Mr. Eisaman testified that he never provides consumers with any written materials or literature, nor does he direct customers to any websites.

> Q. Do you ever give them [technical literature available on NGHL's website] to prospective customers?
> A. There's no reason to.
> Q. And why is that?
> A. It's well beyond their knowledge as far as air conditioning what we're looking up.
> …
> Q. What about consumer brochures or pamphlets, do you have access to those?
> A. We do.
> Q. But you don't ever give those to consumers?
> A. No.
> Q. And why is that?
> A. Like I said before, the homeowners want to be nice and cool. They don't care how that product is getting delivered to them, what name is on it. You might have 10 percent that might ask that.

Eisaman Dep. at 30:13-31:10 (Ex. 13). In other words, many consumers were not exposed to – and never could have been exposed to – any materials in which disclosures regarding formicary corrosion could be made.

In contrast, however, other consumers do conduct research on various HVAC brands in advance of their purchase, including by viewing manufacturer websites and/or manufacturer brochures. Sidebottom Decl. at 9-10 (Ex. 20). Unlike Plaintiff Stark's contractor, Plaintiff

Harris's contractor testified that in situations where he interacts directly with the consumer, he does usually provide consumers with product brochures, including those available on NGHL's contractor portal. Saccone Dep. at 54:15-55:12 (Ex. 14).[14]  Given NGHL's disclosures, those consumers who viewed manufacturer websites and/or manufacturer brochures – as well as those who had detailed discussions with their contractors – may very well have been aware of the reported risk of formicary corrosion and its consequences.

## VII.    A Disclosure Regarding Formicary Corrosion Would Not Cause Many Consumers To Change Their Purchasing Behavior

Plaintiffs claim they are damaged by NGHL's alleged omissions because they "and Class Members would not have purchased HVAC systems manufactured by [NGHL], or would have paid less for them, had they known of the defective evaporator coils." Am. Compl. ¶ 30. In order to assess the veracity of these allegations, NGHL's marketing expert, Jane Sidebottom, designed a survey in which respondents were shown brochures from NGHL and two other leading HVAC manufacturers that described HVAC units with comparable specifications and pricing. Sidebottom Decl. at 15 (Ex. 20). The same brochures were shown to a control group and a target group, except the NGHL brochure shown to the target group included a prominent disclosure with the following language:

> Copper evaporator coils have a susceptibility to leak refrigerant due to formicary corrosion. If such leaks develop, the coil will need to be replaced. As is standard in the industry, for the original, registered consumer, if a coil failure occurs within the warranty period, the manufacturer will provide a replacement part pursuant to its parts-only Limited Warranty. The Limited Warranty does not cover labor costs, which in some instances can be one thousand dollars or more. An extended warranty that would cover those costs, if they arise, can be purchased separately. *Id.* at 15.

The disclosure was extremely conservative because it: (a) greatly overstated the risk of formicary corrosion;[15] (b) greatly overstated the potential cost of replacing an evaporator coil;

---

[14] Unlike individual consumer sales, Plaintiff Harris's contractor testified that he typically does not provide any brochures in connection with the sale of an HVAC unit for a newly constructed home, as his only interaction in those circumstances is usually with the builder and builders "truly only want to know how much does it cost." Saccone Dep. at 147:15-24 (Ex. 14).

[15] This is evident because the survey asked respondents what they thought the word "susceptibility" meant in terms of the percent likelihood that the coil would leak from formicary corrosion, and the average response rate across both groups was 47.5%. *Id.* at 18.

and (c) gave the appearance that NGHL is the only manufacturer whose coils are susceptible to formicary corrosion.[16]   The survey results showed that the inclusion of the disclosure had no impact on the purchasing behavior of respondents.  *Id.* at 19.  Specifically, there was no statistically significant difference between the two groups with respect to how likely respondents were to purchase the NGHL HVAC unit.  *Id.* at 18-19.  There was also no statistically significant difference between the two groups with respect to the (very small) number of respondents who listed evaporator coils as a factor important to their purchase of an HVAC system.  *Id.*

## VIII.   The Named Plaintiffs' Circumstances Demonstrate The Individualized Nature Of The Lawsuit

### A.     Ms. Debra Harris

In 2009, Plaintiff Harris purchased an empty lot in Orlando, Florida. June 23, 2015 Deposition of Debra Ann Harris ("Harris Dep.") (Ex. 28) at 14:19-15:23.  In November 2010, she hired a general contractor to build a home on that lot.  *Id.* at 19:22-20:1; 20:15-16.  In connection with the construction of her home, GreenDog Energy Solutions LLC ("GreenDog") installed two split-system HVAC units in her home that were manufactured by NGHL and sold under the Broan brand name (the "Broan HVAC Units").  *Id.* at 24:23-25:16.  Plaintiff Harris, however, had absolutely no input in the selection or purchase of her Broan HVAC Units:

> Q.  So you had no input in the selection of your units?
> A.  None.
> Q.  Who selected the Broan HVAC Units that were installed in your home?
> A.  GreenDog.
> Q.  And you never spoke to GreenDog about how you were going to select those units.
> A.  No.
> …
> Q.  [Did you] speak with [your general contractor] about the selection of your HVAC units?
> A.  He said he left it up to GreenDog.  There's – within construction, there's a good ol' boy network, so he came from a recommendation, had used GreenDog. He went with GreenDog.  As far as I remember Chuck saying to me, he let GreenDog handle it… he left it up to them.

---

[16] At least four other leading HVAC manufacturers have been the subject of putative class action lawsuits based on virtually identical allegations regarding formicary corrosion.  *E.g. PB Property Mgmt. v. Goodman Mfg. Co., et. al.*, 3:12-CV-1366-HES-JBT (M.D. Fla.); *Sumer v. Carrier Corp.*, 3:14-cv-04271-VC (N.D. Cal.); *Justice v. Rheem Mfg. Co.*, 9:14-cv-80017-WPD (S.D. Fla.); *Thomas v. Lennox Indus., Inc.*, 1:13-cv-07747 (N.D. Ill.).

WE L:\95491175\8\65859.0025

Q. And did he ever ask you what factors were important to you in connection with the purchase of your HVAC unit?
A. No.
Q. And did you ever have any discussions with him about the selection of the HVAC unit and how you were going to select that unit?
A. No.

*Id.* at 31:1-12; 32:14-33:5.

Because GreenDog selected her Broan HVAC Units, Plaintiff Harris did not conduct any research regarding the selection of her units, nor did she receive any written materials or view any advertisements regarding the units. *Id.* at 31:20-22; 36:12-24. She further stated that she did not see or rely on any oral or written statements regarding her units prior to purchase. *Id.* at 36:25-37:5. In fact, Plaintiff Harris testified that she was not even aware of which HVAC brand she had purchased until after the sale and installation of her units. *Id.* at 35:15-36:6.

Plaintiff Harris testified that upon purchasing her Broan HVAC Units and moving into her home, she chose to conduct the maintenance on the units herself. *Id.* at 39:23-42:2. According to Plaintiff Harris, this "maintenance" included mixing 1 cup of vinegar (an indisputably corrosive agent) with a pitcher of water and pouring this solution into the condensate tubes every 3-6 months, a component which is located just below the evaporator coil. *Id.* at 39:35-40:25. Allegedly, in July 2013, Plaintiff Harris's 3.5 ton unit was "not functioning properly" and GreenDog determined that refrigerant "was leaking from holes in the system's copper evaporator coils and preventing the system from generating cool air." Am. Compl. ¶ 36. Although not included in the Amended Complaint, Plaintiff Harris testified at her deposition that her 1.5 ton unit also began leaking in the spring of 2015. Harris Dep. at 76:24-77:9 (Ex. 28).

Plaintiff Harris alleges that the evaporator coil in her 3.5 ton unit failed as a result of formicary corrosion. March 4, 2015 Plaintiff Debra Harris' Answers and Objections to Defendant's First Set of Interrogatories ("Harris Answers") (Ex. 29), Answer Nos. 8, 11, 12. At her deposition, however, Plaintiff Harris could not provide any basis for this allegation. On the contrary, she testified that no one ever informed her that her evaporator coils were leaking as a result of formicary corrosion. Harris Dep. at 71:22-24; 72:4-13 (Ex. 28).[17] Plaintiff Harris's HVAC contractor confirmed that he never determined what caused the alleged leak in either of

---

[17] In fact, at the time of her deposition, Ms. Harris had "never heard" of formicary corrosion before and stated "I don't know what that is" when asked whether her allegations related to it. *Id*. at 79:23 – 80:5; 94:12-15.

her evaporator coils, and he never determined that there was any formicary corrosion in the coils. Saccone Dep. at 212:13-18; 201:2-7 (Ex. 14). He also stated that it is possible the alleged leak was caused by something that went wrong during installation, or by sulfur-induced corrosion. *Id.* at 189:1-13; 193:25-194:4. Mr. Sikorsky also testified that he has no opinion that the alleged leak in the 3.5 ton coil was due to formicary corrosion. Sikorsky Dep. at 199:10-13 (Ex. 1).

Neither Plaintiff Harris nor GreenDog are in possession of the evaporator coil from the 3.5 ton unit, nor do they know the current location of the coil. Harris Dep. at 81:10-23 (Ex. 28); Saccone Dep. at 194:18-195:1 (Ex. 14). An inspection of Ms. Harris's home was conducted in June 2015, however, and this inspection revealed that carbon disulfide (*i.e.*, sulfur) was reported at approximately double the recommended level. Baker Decl. at ¶ 43 (Ex. 12). According to a report published by the CPSC, the carbon disulfide level found in Mr. Harris' home is considerably *higher* than the mean level of carbon disulfide found in homes containing Chinese drywall. Sikorsky Dep. Ex. 25 (Ex. 30).[18]

Because the evaporator coil from the 1.5 ton unit allegedly developed a leak after the litigation began, the parties were able to remove the coil from the home of Plaintiff Harris and send it to a laboratory for testing, which was jointly conducted by Dr. Budiansky and Mr. Sikorsky. As Mr. Sikorsky admitted (and Plaintiffs neglect to mention in their Motion), the metallurgical analysis did not reveal *any evidence* of formicary corrosion on the coil. Sikorsky Dep. at 185:7-18 (Ex. 1). The coil did, however, exhibit evidence of a form of corrosion known as pitting corrosion – which is distinct from formicary corrosion – as well as sulfur in the vicinity of the pit. *Id.* at 185:20-22; 187:3-9. The results of the home inspection, in conjunction with the testing of the evaporator coil from the 1.5 ton unit and the fact that Plaintiff Harris's home was newly constructed in 2010, are all consistent with sulfur-induced corrosion potentially resulting from the use of Chinese drywall. Budiansky Decl. at 9-10 (Ex. 2). Even Mr. Sikorsky conceded that he could not rule out the possibility that either of Ms. Harris's coils were leaking as a result of sulfur-induced corrosion. Sikorsky Dep. at 197:19-198:4 (Ex. 1).

## B. Ms. Barbara Stark

Plaintiff Stark owns a manufactured home located in Punta Gorda, Florida, which she purchased in 2010. Stark Dep. at 15:25-16:10 (Ex. 22). In February 2012, Cliff's Air

---

[18] The inspection also revealed significant darkening on the inside of the refrigerant line on the 3.5 ton unit, which is consistent with sulfur exposure. Baker Decl. at ¶ 43 (Ex. 12).

Conditioning & Heating ("Cliffs") installed in Plaintiff Stark's home a package HVAC unit, which was manufactured by NGHL and sold under the Frigidaire brand name (the "Frigidaire HVAC Unit"). *Id*. at 23:15-24:12. Plaintiff Stark testified that she had absolutely no input in the selection of her Frigidaire HVAC Unit and that Cliffs unilaterally selected the unit that was to be installed in her home. *Id*. at 23:18-24:10. She stated "I simply left it to the technician that came and told me what I needed… I do not recall speaking with anyone else other than the technician that told me, you know, 'This is what you need to do.'" *Id*. at 23:23-24:10. She further testified that there were no other factors aside from Cliffs' selection that were important to her with respect to selecting her HVAC unit. *Id*. at 25:5-18. In fact, when asked whether Cliffs recommended the Frigidaire HVAC Unit to her, Ms. Stark responded "I wouldn't say they recommended. That's what was delivered to my home and installed. I don't think I was ever asked, 'Do you want a Frigidaire?'" *Id*. at 27:1-11.

Because she relied entirely on Cliffs' selection, Plaintiff Stark did not conduct any research regarding the selection of her Frigidaire HVAC Unit, nor did she receive any written materials or view any advertisements regarding the unit. *Id*. at 31:8-32:8; 33:3-34:14. She also did not consult or rely on any written or oral materials whatsoever in selecting her HVAC unit. *Id*. at 48:8-49:16. Plaintiff Stark also stated that Cliffs did not discuss different HVAC brands with her in advance of purchase and she was not even aware she had purchased a Frigidaire brand HVAC unit until after the unit was installed in her home. *Id*. at 29:9-13.

Plaintiff Stark alleges that in September 2013, the system was "not generating cool air" and Cliffs determined the evaporator coil had failed. Am. Compl. ¶¶ 43-44. She also alleges that her evaporator coil failed as a result of formicary corrosion. March 4, 2015 Plaintiff Barbara Stark's Answers and Objections to Defendant's First Set of Interrogatories ("Stark Answers") (Ex. 31), Answer Nos. 8, 11, 12. At her deposition, however, Plaintiff Stark could not provide any basis for this allegation. On the contrary, she testified that no one ever informed her that her evaporator coil was leaking as a result of formicary corrosion. Stark Dep. at 83:1-84:10; 85:8-86:20 (Ex. 22). Plaintiff Stark's HVAC contractor confirmed that he never determined what caused the alleged leak in her evaporator coil, and he never determined there was any formicary corrosion on the coil. Eisaman Dep. at 85:14-25 (Ex. 13). He also stated that it is "absolutely" possible the alleged leak was caused by something other than corrosion, including something that went wrong during installation. *Id*. at 86:2-9. Mr. Sikorsky also testified that he has no opinion

19

that the alleged leak in Plaintiff Stark's evaporator coil was due to formicary corrosion. Sikorsky Dep. at 200:3-6 (Ex. 1).   Neither Plaintiff Stark nor Cliffs are in possession of the evaporator coil from the Frigidaire HVAC unit, nor do they know the current location of the coil. Stark Dep. at 102:23-103:23 (Ex. 22); Eisaman Dep. at 92:10-93:8 (Ex. 13).   As a result, it is impossible to confirm whether the coil was actually leaking and, if there was a leak, the cause of the leak. Sikorsky Dep. at 199:14-200:6 (Ex. 1).

## LEGAL STANDARD

"The burden of proof to establish the propriety of class certification rests with the advocate of the class." *Vega v. T-Mobile USA, Inc*. 564 F.3d 1256, 1265 (11th Cir. 2009) (citation omitted). In order for a class to be certified in the Eleventh Circuit, a plaintiff "must establish that the proposed class is 'adequately defined and clearly ascertainable." *Little v. T-Mobile USA, Inc*., 691 F.3d 1302, 1304 (11th Cir. 2012). In addition, Plaintiffs must satisfy the requirements of Rule 23(a) of the Federal Rules of Civil Procedure:   "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." *See* Fed. R. Civ. P. 23(a)(1)-(4).

Furthermore, the proposed class must also fit within one of the categories described in Rule 23(b). Here, Plaintiffs have sought class certification under Rule 23(b)(3) and Rule 23(b)(2). A Rule 23(b)(3) class requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3) (emphasis added). A Rule 23(b)(2) class requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2557 (2011). A Rule 23(b)(2) class is not appropriate, however, when "monetary relief is not incidental to the injunctive or declaratory relief sought" or "when each class member would be entitled to an individualized award of monetary damages." *Id.*

## ARGUMENT

### I.      Plaintiffs' Class Is Not Adequately Defined Or Clearly Ascertainable

The Eleventh Circuit has affirmed that a class is not adequately defined where it includes class members who "did not suffer any loss." *Walewski v. Zenimax Media, Inc.,* 502 F. App'x 857, 861 (11th Cir. 2012) (quoting district court decision with approval).  Thus, a class definition is inadequate and overbroad where it includes consumers who had "no complaints" about the product or who "never experienced the [alleged] defect," because these consumers "did not suffer any loss."  *Id.*  As such, Plaintiffs' proposed class – which includes every consumer in Florida who purchased an NGHL HVAC system containing a copper evaporator coil – is not adequately defined under Eleventh Circuit precedent.  Many (if not almost all) members of the proposed class did not suffer any loss because their NGHL HVAC system has never, and will never, experience a single problem with the evaporator coil, let alone an evaporator coil leak caused by formicary corrosion.

Despite this precedent, Plaintiffs nevertheless contend that the class can properly include consumers for whom the alleged defect did not manifest under a "propensity to manifest a defect" theory.  Mot. at 26; *see also id.* at 21, 23-24.  But that contention is inapposite to every single relevant decision in Florida.  Courts in Florida applying FDUTPA have made clear that Florida law "firmly align[s itself] with th[e] majority jurisprudence," which provides that a "case cannot proceed as a class action" where the class representative "seeks compensation not only for class members whose [products] have manifested a deficiency, but also for those whose [products] have performed satisfactorily."  *Kia Motors Am. Corp. v. Butler,* 985 So. 2d 1133, 1138-39 (Fla. Dist. Ct. App. 2008).[19]  As the court in *Breakstone v. Caterpillar, Inc.,* explained "it is inappropriate to certify a class [alleging FDUTPA claims] containing both individuals who have 'manifested a deficiency' and those whose product has 'performed satisfactorily' since the

---

[19] In reaching this conclusion, the court in *Kia Motors* relied on the reasoning of the Seventh Circuit, which explained that a theory like the one espoused here – based on a "risk of failure" that made "each widget less valuable" – could conceivably result in the manufacturer outlaying "nearly double the total loss created by the product's defect."  *Id.* at n. 5 (quoting *In re Bridgestone/Firestone, Inc.,* 288 F. 3d 1012, 1017 (7th Cir. 2002)).  This result "would both overcompensate buyers as a class and induce manufacturers to spend inefficiently much to reduce the risks of defect."  *Id.*

injuries of the putative class members with no manifest injury only have speculative damages." 2010 WL 2164440, at *6 (S.D. Fla. May 26, 2010); *see also* Section III.A.2.b (pp. 31-32) *infra*.

The only Florida cases Plaintiffs cite in support of their position that addressed a product defect (Mot. at 24, 26) arose in a decidedly different and unique context.  Unlike here, both involved the manifestation of an "unreasonably dangerous" defect.  *Rosen v. J.M. Auto Inc.,* 270 F.R.D. 675, 677 (S.D. Fla. 2009) (involving an automobile air bag defect); *Collins v. DaimlerChrysler Corp.,* 894 So. 2d 988, 991 (Fla. Dist. Ct. App. 2004) (involving automobile seat belt defect).  As the court in *Collins* reasoned, in the context of such a product, there is "no requirement in FDUTPA that a defect manifest itself by failing to operate *in an emergency or by causing injury.*"  *Id.* at 990 (emphasis added).  Critically, the court made clear that such unreasonably dangerous cases present "unique" circumstances with "special reliability" concerns regarding "the emergency protection of human life."  *Id.* at 991, n.3.  These cases are clearly inapplicable here, particularly in light of plethora of contrary jurisprudence, where no threat of danger or bodily injury is alleged.[20]

Importantly, Plaintiffs' class definition cannot be revised to include only those consumers who have suffered the alleged defect because such a class would not be ascertainable.  The Eleventh Circuit has held that "[i]n order to establish ascertainability, the plaintiff must propose an administratively feasible method by which class members can be identified."  *Karhu v. Vital Pharms., Inc.*, 2015 WL 3560722, at *2 (11th Cir. June 9, 2015); *see also Bussey*, 562 F. App'x 782, 787 (11th Cir. 2014).  The Eleventh Circuit described administrative feasibility as "a manageable process that does not require much, if any, individual inquiry."  *Id.* at 787.  Thus, class membership is administratively infeasible where "it requires a 'series of mini-trials just to evaluate the threshold issue of which [persons] are class members."  *Karhu*, 2015 WL 3560722, at *3.  Here, there is no available data from which to readily identify consumers who suffered the

---

[20]  The other Florida cases Plaintiffs cite in making this argument (Mot. at 24, 26) are inapplicable as they did not involve a product defect and the issue of manifestation was never at issue.  *See Veal v. Crown Auto Dealerships, Inc.,* 236 F.R.D. 572 (M.D. Fla. 2006) (alleging failure to adequately disclose the cost of a product called "Etch," which was included as part of a vehicle theft protection); *Miles v. Am. Online, Inc.*, 202 F.R.D. 297 (M.D. Fla. 2001) (alleging "uniform, standardized advertising and promotional campaign" that induced consumers to subscribe to internet access); *Davis v. Powertel, Inc.*, 776 So. 2d 971, 972 (Fla. Dist. Ct. App. 2000) (alleging deceptive practice of selling cellular telephones without informing consumers that the phones could only be operated with defendant's wireless communication service).

defect.  As discussed in Section III (p. 8) *supra*, neither the warranty claims data nor any existing data indicates the cause of any particular coil claim, including whether the coil claim is attributed to formicary corrosion.  In fact, the warranty claims data is not even definitive evidence of the existence of a coil leak.  As Plaintiffs' expert readily admits, the only way to determine that information is to individually examine and test each consumer's coil.  Sikorsky Decl. at ¶¶ 34-35 (Ex. 3).  As such, a properly defined class would not be ascertainable.

Of note, even under the current proposed class definition, the class still is not ascertainable.  *First*, Plaintiffs exclude from the class consumers who have a warranty that covers labor and refrigerant.  Mot. at 1.  But there is no available data indicating which consumers have purchased such a warranty, which can come from many sources – including consumers' HVAC contractors or from whole home insurance policies.  Sidebottom Decl. at 13 (Ex. 20); Lattanzi Oct. 2 Dep. at 151:10-152:7 (Ex. 10); Eisaman Dep. at 35:8-25 (Ex. 13).  Only an individual inquiry of each consumer can ascertain that information.  *Second*, Plaintiffs contend that class membership can be determined through NGHL's "warranty registration and warranty claims databases, as well as by tracking sales through the supply chain sales databases of [NGHL], distributors and contractors."  Mot. at 20.  However, as Mr. Bernatowicz acknowledges, only a "certain percentage… register their units."  Bernatowicz Dep. at 183:1-18 (Ex. 18).  Thus, Plaintiffs would need to track the identity of many class members through the distribution chain.  *Id.* at 191:13-194:12.  But Plaintiffs have provided absolutely no explanation as to how this could be accurately done, or the way in which they intend to do it.  *See Karhu*, 2015 WL 3560722, at *4 (proposal to identify class members using "sales data" was incomplete, "insofar as [plaintiff] did not explain how the data would aid class-member identification").  Indeed, the evidence demonstrates that class member identification cannot be accurately achieved through supply chain sales databases because – like Plaintiff Harris' own HVAC contractor – many HVAC contractors may no longer have sales records dating to the beginning of the class period.  Saccone Dep. at 14:5-18 (Ex. 14) (testifying he no longer has sales records from when Plaintiff Harris purchased her unit).  Accordingly, even under the current definition, the class fails the ascertainability requirement.

**II.    Plaintiffs Cannot Establish Commonality Under Rule 23(A) Because There is No Evidence of Any Defect, Let Alone a Uniform Defect**

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  In *Wal-Mart Stores, Inc. v. Dukes*, the Supreme Court held that the commonality element requires that the action involve a common contention that is capable of class-wide resolution, "which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." 131 S. Ct. at 2551.  "What matters to class certification … is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Id.* (emphasis in original) (citation omitted).

Here, all of the purported common questions described both in the Amended Complaint and in the Motion which could conceivably drive the resolution of the litigation are premised on a determination that there is a common defect in NGHL's copper evaporator coils.  Am. Compl. ¶ 53; Mot. at 14.  But Plaintiffs have not presented a scintilla of evidence as to the existence of any defect.  Their own expert testified that, despite its susceptibility to formicary corrosion, copper is not a defective material for coil fabrication and that he does not know of any specific defect in the design or manufacture of NGHL's evaporator coils.  *See* Section I (pp. 3-5) *supra*. As Mr. Sikorsky is Plaintiffs' only liability expert, Plaintiffs have failed to offer any evidence necessary to establish the existence of a defect in NGHL's copper evaporator coils.  *See Cramer v. Ford Motor Co., Inc.*, 2011 WL 2477232 (Fla. Cir. Ct. June 9, 2011) ("Under Florida law, when a Plaintiff bases a FDUTPA claim upon a product defect, the plaintiff must prove that the product is defective" and in order "to prove a product defect, including a design defect, a plaintiff must offer an expert opinion that the product is indeed defective"); *Alexander v. Danek Med., Inc.*, 37 F. Supp. 2d 1346, 1349 (M.D. Fla. 1999) ("To prove a defective product, a defect must be proven by expert testimony").  Thus, without such evidence, there can be no common questions apt to drive the resolution of the litigation.

Beyond this, the class definition includes every single copper evaporator coil model manufactured by NGHL in the last five years.  This is a critical flaw because there are material differences between these models that impact the propagation and risk of formicary corrosion. As discussed in Section II (pp. 6-7) *supra*, NGHL began manufacturing Luvata Coils in 2010. Because Luvata Coils are fifty-times more resistant to formicary corrosion, Plaintiffs cannot rely

24

on common evidence to prove a defect with both Luvata Coils and standard copper evaporator coils.[21]  There are also material differences amongst NGHL's standard copper evaporator coils that bear on the propagation and risk of formicary corrosion, ███████████ ██████████████████████████████  *See* Section II (p. 6) *supra*.

Courts across the country have consistently held that a plaintiff cannot prove a common defect where there are differences amongst various models of the product at issue.  For instance, in *Kia Motors*, the court held that due to differences in the three models of the vehicle at issue, it was "scientifically and logically impossible to conclude that any performance issues for these three model years were the result of a common design."  985 So. 2d at 1138.  Similarly, *In re Am. Med Sys., Inc.*, the court held that commonality was not satisfied because the plaintiffs' claims would "differ depending upon the model and the year [the product] was issued."  75 F.3d 1069 (6th Cir. 1996); *see also Benner v. Becton Dickinson Co.*, 214 F.R.D. 159 (S.D.N.Y. 2003) (similar).[22]  Consistent with this reasoning, Plaintiffs cannot prove a common defect on the copper evaporator coils that are included in the class definition.  As such, they cannot establish any common question capable of driving the resolution of the litigation.

### III.  Plaintiffs Cannot Satisfy The Requirements Of Rule 23(B)(3) Because A Host of Fundamental, Individualized Issues Will Predominate the Claims

In addition to the requirements of Rule 23(a), Plaintiffs cannot meet the predominance requirement of Rule 23(b)(3), which is "far more demanding" than the requirement of

---

[21]  As discussed in Section II (p. 7) *supra*, consumers with Luvata Coils cannot be readily excluded from the class without individually examining and analyzing each coil because NGHL did not provide distinct serial and model numbers for its Luvata Coils.

[22]  These facts stand in contrast with the cases cited by Plaintiffs in support of commonality.  In those cases, a uniform defect existed with no material differences amongst the models.  *See Helmer v. Goodyear Tire & Rubber Co.*, 2014 WL 1133299, at *1 (D. Colo. Mar. 21, 2014) (finding commonality where there was only one product at issue and there was "scientific and technical evidence" to support the theory that it was defective); *Terrill v. Electrolux Home Prods., Inc.*, 295 F.R.D. 671, 696 (S.D. Ga. 2013) (although there were various models, all models included the alleged uniform defective bellow around the washing machine); *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 854 (6th Cir. 2013) (despite involving two platforms of washing machines, there was a common defect and identical engineering).  In fact, the court in *In re Whirlpool Corp. Front-Loading Washer Products Liab. Litig.*, explicitly emphasized that commonality was satisfied only because the evidence "confirm[ed] that the two platforms are nearly identical, the design issues concerned various models, and most of the differences in models were related to aesthetics, not design."  722 F.3d at 854.

commonality.  *Vega*, 564 F.3d at 1270 (citation omitted).  Predominance is not satisfied where the resolution of common issues will "break[] down into an unmanageable variety of individual legal and factual issues."  *Cooper v. Southern Co.*, 390 F. 3d 695, 722 (11th Cir. 2004).

A. **Individualized Issues Predominate As to Each of the Elements of The FDUTPA Claim**

A plaintiff asserting a claim under FDUTPA must establish three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages.  *Virgilio v. Ryland Group, Inc.*, 680 F.3d 1329, 1338 (11th Cir. 2012).  Here, Plaintiffs' predominance arguments are premised solely on the allegation that the claims of all class members "involve the same defect and the same failure to disclose."  Mot. at 23.  But even if there is uniform defect across all NGHL products (there is not), individualized factual inquiries will nevertheless have to be conducted as to *each* of the elements of FDUTPA in order to resolve the claims of putative class members.  Because the litigation will inevitably "break[] down into an unmanageable variety of individual legal and factual issues," the claims are not suitable for class certification.  *Cooper*, 390 F. 3d at 722.

1. *Plaintiffs Cannot Prove A Classwide Deceptive Act Because Putative Class Members Are Not Uniformly Exposed to the Alleged Deception*

An act or practice is deceptive if it is "likely to deceive a consumer acting reasonably *in the same circumstances*."  *In re Motions to Certify Classes Against Court Reporting Firms for Charges Relating to Word Indices* ("*In re Motions to Certify*"), 715 F. Supp. 2d 1265, 1282 (S.D. Fla. 2010), *aff'd*, *Webber v. Esquire Deposition Servs.*, LLC, 439 F. App'x 849 (11th Cir. 2011) (emphasis added) (citation omitted).  While this standard is governed by the "reasonable consumer" test, it "requires consideration of the factual circumstances that counsel a reasonable person to act in a particular way or hold a particular belief."  *Id.* at 1282.  Thus, as the Eleventh Circuit made clear, certification of a FDUTPA claim is properly denied where individualized issues arise as a result of "differences in the circumstances under which putative class members purchased [the product at issue]."  *Webber*, 439 F. App'x at 851.  In other words, a FDUTPA claim cannot be certified where "the question of whether 'a consumer acting reasonably in the same circumstances' would be deceived, yields a different answer" for different putative class members.  *Pop's Pancakes, Inc. v. NuCO2, Inc.*, 251 F.R.D. 677, 685 (S.D. Fla. 2008).

WE L:\95491175\8\65859.0025

Pursuant to this standard, courts have held that in order to prove a classwide deception under FDUTPA, a plaintiff must demonstrate that "each putative class member was exposed to the Defendants' advertising and marketing materials alleged to constitute a deceptive trade practice." *Montgomery v. New Piper Aircraft, Inc.*, 209 F.R.D. 221, 229 (S.D. Fla. 2001); *see also Berenguer v. Warner-Lambert Co.*, 2003 WL 24299241, at *2 (Fla. Cir. Ct. July 31, 2003) (same). If common evidence cannot demonstrate classwide exposure to the alleged deception, then certification of a FDUTPA claim must be denied because the question of whether a deceptive act occurred would yield a different answer for different putative class members. *See Montgomery,* 209 F.R.D. at 230 (denying certification where "[i]ndividualized inquiries [were] necessary to explore whether any particular class member received an alleged misrepresentation from the Defendants…"); *Pop's Pancakes, Inc.*, 251 F.R.D. at 685 (denying certification where class members were exposed to different information and some class members "could not reasonably assert that they were likely to be deceived"). As the court in *Marino v. Home Depot U.S.A., Inc.*, aptly explained, where the plaintiff cannot "point to any circumstance that would prove that for every putative class member, the same omission occurred," the result would be "numerous 'mini trials' on the issue of whether the first element of a FDUTPA claim had occurred." 245 F.R.D. 729, 737 (S.D. Fla. 2007); *see also Miami Auto. Retail, Inc. v. Baldwin*, 97 So. 3d 846, 857-858 (Fla. Dist. Ct. App. 2012) (a class may not be certified where each plaintiff "will have received a different communication and may have reacted differently" because "mini trials will be necessary to determine what representations were made … at the time of the transaction").

As discussed in Section VI (pp. 12-15) *supra*, given the highly individualized nature of the circumstances surrounding an HVAC purchase, classwide exposure to a deceptive act cannot be inferred. For instance, given the many detailed disclosures made by NGHL during the class period, many putative class members could have or should have been aware of the existence and perceived risk of formicary corrosion. Indeed, nearly 34,000 unique users have viewed the consumer webpages in which some of these disclosures are contained. *See id.* If even a fraction of these users ultimately purchased an NGHL HVAC unit with a copper evaporator coil, there will be *thousands* of class members who cannot claim they were exposed to any deception under FDUTPA. *See, e.g., Pop's Pancakes Inc.*, 251 F.R.D. at 684 (consumers who knew of the allegedly omitted information "could not reasonably assert that they were likely to be deceived").

27

Thus, consistent with the holding of every Florida district court facing this same issue, certification of the FDUTPA claim must be denied. *See, e.g., id*; *O'Neill v. Home Depot U.S.A., Inc.,* 243 F.R.D. 469, 480 (S.D. Fla. 2006) (denying certification where members of the putative may have been aware of the alleged omission from their individual sales representative or from their own research, and noting that "courts have consistently rejected requests to certify such types of claims").[23]

In addition to this, many putative class members were never exposed to any materials in which the allegedly omitted information could have plausibly been disclosed.  As discussed in Section VI (p. 14) *supra*, many consumers, including both named Plaintiffs, are not provided – and do not make any effort to obtain – any materials or information regarding the system they intend to purchase.  These consumers would never have seen any materials that could plausibly contain the allegedly omitted information and therefore cannot claim to have been deceived by the alleged omission.  *See Cohen v. Implant Innovations, Inc.*, 259 F.R.D. 617, 628 (S.D. Fla. 2008) (holding that class certification must be denied where class members are not provided with a uniform set of materials because "the issue of whether each putative class member actually received Defendant's marketing materials is an individual question of fact critical to each member's claim that predominates over any common issues of fact").[24]  Notably, in *McVicar v. Goodman, Inc.*, a case alleging nearly identical allegations of omission against HVAC manufacturer Goodman, the court denied certification of the plaintiff's consumer protection claims because of this very fact.  2015 WL 4945730, *11 (C.D. Cal. Aug. 20, 2015).  The court reasoned that, in a case alleging omissions, "there must be some method to conclude that there was exposure of some materials containing representations to the class, in order to establish that 'had the omitted information been disclosed, one would have been aware of it and behaved

---

[23] *See also Marino*, 245 F.R.D. at 737 (denying certification because determining whether an omission occurred would depend on the individualized interaction between each class member and their salesperson); *Kia Motors*, 985 So. 2d at 1140 (same).

[24] Given that some members of the class do conduct research and view materials, these facts also demonstrate that Plaintiffs cannot meet the typicality requirement of Rule 23.  In the FDUTPA context, courts hold that typicality is not satisfied where the class representative's exposure to the allegedly omitted information class differs from the exposure of other class members.  *See O'Neill*, 243 F.R.D. at 479 (noting that under these circumstances "while [the class representative] may be typical of some of the proposed class members, he is not typical of all the myriad class members who may be encountered"); *Pop's Pancakes, Inc.*, 251 F.R.D. at 683 (similar).

28

differently.'" *Id.* (citation omitted).   However, like here, many members of the proposed class "never saw advertisements or representations of any kind before deciding to purchase the company's product." *Id.* (alterations omitted).   Thus, individual questions predominated regarding "whether putative class members were exposed to any … marketing materials omitting material information." *Id.* at *12.

Because an individualized inquiry is therefore necessary to determine the circumstances under which each putative class member was acting at the time of purchase – including the types of information to which each member was exposed or could have been exposed – individualized issues will predominate as to the first element of Plaintiffs' FDUTPA claim.   This warrants denial of class certification.   *See Pop's Pancakes, Inc.*, 251 F.R.D. at 685.

2.     *There is No Classwide Evidence of Causation*

The second element of FDUTPA is the element of causation.   "In order for the consumer to be entitled to any relief under FDUTPA, the consumer must not only plead and prove that the conduct complained of was unfair and deceptive but the consumer must also plead and prove that he or she was aggrieved by the unfair and deceptive act." *Cohen*, 259 F.R.D. at 644 (citation omitted).   Here, the unrebutted record in this case demonstrates that Plaintiffs cannot prove causation on a classwide basis for at least two reasons: (1) there is no classwide evidence that disclosure of the allegedly omitted information would cause a reasonable consumer to change their purchasing behavior; and (2) there is no classwide evidence that consumers experienced an actual coil failure caused by the alleged defect in this case.

a.     Common Evidence Cannot Establish That Disclosure of the Alleged Omitted Information Would Cause a Reasonable Consumer to Change Their Purchasing Behavior

Plaintiffs allege that they and putative class members "would not have purchased HVAC systems manufactured by [NGHL], or would have paid less for them, had they known of the defective evaporator coils." Am. Compl. ¶ 30; *see also* Mot. at 24.   However, the survey evidence reveals that even the most conservative disclosure – one which greatly overstates the risk of formicary corrosion and its potential cost to the consumer – would not cause many putative class members to change their purchasing behavior.   As discussed in Section VII (pp. 15-16) *supra,* respondents were just as likely to purchase an NGHL HVAC system over other comparably-priced HVAC brands, regardless of whether they were shown a disclosure informing them of the copper evaporator coil's susceptibility to formicary corrosion.

This fact is underscored by the opinions of Plaintiffs' own expert, who testified that he does not believe copper's susceptibility to formicary corrosion renders it a defective material for coil fabrication and that aluminum – the only alternative material to copper – is not a better material for coil fabrication.  *See* Section I (pp. 3-5) *supra*.  If copper's susceptibility to formicary corrosion does not render it defective – and there is no better alternative material for coil fabrication – it is unreasonable to presume that all reasonable consumers would have acted differently had they known about formicary corrosion.   And a consumer who does not change their purchasing behavior despite knowledge of the alleged deception "cannot claim to have suffered any damage from the allegedly misleading statements."  *Prohias v. Pfizer*, 485 F. Supp. 2d 1329, 1336 (S.D. Fla. 2007).

Accordingly, because there is a lack of consensus as to whether a reasonable consumer would change their purchasing behavior in light of the allegedly omitted information, individualized issues of fact predominate on the element of causation.  As this court articulated in *Randolph v. J.M. Smucker Co.*, a class cannot be certified where there is a "lack of consensus" as to whether the challenged act is deceptive to a reasonable consumer.  303 F.R.D. 679, 695 (S.D. Fla. 2014); *see also Miami Auto. Retail, Inc.* 97 So.3d at, 859 (holding that FDUTPA claim could not be certified in part due to individualized question of whether the allegedly deceptive information was "immaterial to the purchaser's decision").[25]

> b. A Highly Individualized Inquiry is Necessary to Determine Whether Class Members Experienced a Coil Failure Caused by Formicary Corrosion

Plaintiffs also cannot prove causation on a classwide basis because there is no available data indicating whether class members actually experienced a leak caused by formicary corrosion – a necessary predicate for any FDUTPA claim based on the existence of formicary

---

[25] Notably, in *McVicar*, Goodman presented very similar survey evidence showing that most consumers would not have changed their purchasing behavior had they been shown a disclosure regarding formicary corrosion.  *McVicar*, 2015 WL 4945730 at *12-13 n.9.  On the basis of this evidence, the court found yet another basis for denying class certification, concluding that "Plaintiffs have not shown that consumers would uniformly find any alleged 'defect' material to their purchase decision."  *Id.* at *13.[25] While this conclusion bore only on one of the Plaintiffs' claims, which required an element of materiality, this Court has noted that "the reasoning and conclusions" of these types of cases "are nonetheless persuasive" in determining whether a FDUTPA claim can be certified.  *J.M. Smucker*, 303 F.R.D. at 695.

corrosion.[26]  Specifically, as discussed in Section V (pp. 11-12) *supra*, many claimed coil leaks are misdiagnosed.  More importantly, the vast majority of coil leaks are unrelated to formicary corrosion.  But the information needed to determine these facts is not readily apparent from the warranty claims data or any available classwide data.  Indeed, Plaintiffs' expert himself proposed a highly individualized 3-step testing protocol that would have to be conducted as to each and every class member with an allegedly failed coil to confirm the existence of a leak as well as the occurrence of formicary corrosion.  Sikorsky Decl. at ¶¶ 34-35 (Ex. 3); Sikorsky Dep. at 178:9-179:6 (Ex. 1).

Federal courts in Florida have repeatedly emphasized that a FDUTPA class cannot be certified under these precise circumstances, *i.e.,* where individualized inquiries are necessary in order to determine whether or why any particular class member's product failed.  For instance, the court in *Jones v. Jeld-Wen, Inc.*, denied certification of a FDUTPA claim arising from the allegedly defective resin in glass windows because the jury would have been required to determine – on a member by member basis – whether each window failure was due to the defective resin or some other reason.  250 F.R.D 685, 695 (S.D. Fla. 2008).  The court reasoned that "the need to determine the causation on an individualized basis precludes the ability to maintain the above-styled case as a class action."  *Id.*  Similarly, in *City of St. Petersburg v. Total Containment, Inc.*, the court denied class certification due to the individualized issues involved in proving that the alleged uniform defect was the proximate cause of each class member's damages.  265 F.R.D. 630 (S.D. Fla. 2010).  The court emphasized that – like here – "[i]t will be necessary to determine if the [product] failed because of the alleged uniform defect or for some other reason such as improper installation, improper maintenance, or any other reason."  *Id.* at

---

[26] As discussed in Section I (pp. 21-22) *supra*, consumers are not entitled to recovery under FDUTPA where the alleged defect did not cause an actual failure in their product.  While Plaintiffs contend that determining whether the HVAC units functioned properly for some class members involves an improper assessment of the merits, Mot. at 21-22, that argument is directly contrary to the litany of cases holding otherwise, *see* Section I (pp. 21-22) *supra* and Section III (pp. 31-32) *infra*.  The only case Plaintiffs cite in support of their contention – which is not from a Florida court – is wholly inapposite as the allegation in that case was that "*nobody* was able to grow grass using EZ seed" and therefore the alleged defect rendered EZ seed "worthless."  *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 408-09 (S.D.N.Y. 2015) (emphasis added).

654 (noting that "determining whether there is a uniform defect in certain models of FlexPipe in no way resolves whether the defect did in fact cause any individual class member's harm").[27]

Here too, it is undisputed that there is no classwide evidence that can establish whether class members experienced actual coil leaks, let alone leaks caused by formicary corrosion – the alleged defect at issue in this case.  As such, even if Plaintiffs establish a uniform defect, it is undisputed that the Court will have to conduct a case-by-case inquiry in order to determine whether any particular class member experienced a failure caused by that defect.

    3.    *Plaintiffs Have Not Offered Any Classwide Proof of Damages, Nor Is There Any Such Proof*

        a.    <u>Most Putative Class Members Have Not Suffered Any Damages</u>

The third element of FDUTPA requires a showing of actual damages.  Several Florida courts have made clear that, where "some members of the putative class have sustained an actual loss for which recovery could be sought under FDUTPA, while many others have not … there is no class-wide proof of damages available on the FDUTPA damages claim."  *Rollins, Inc. v. Butland,* 951 So. 2d 860, 873 (Fla. Dist. Ct. App. 2006); *see also Montgomery*, 209 F.R.D. at 230 (denying class certification because "determining the amount of FDUTPA's mandatory damages inquiries for each class member would result in a series of mini-trials to ascertain whether each putative class member has, in fact, been damaged under the statute").  Here, as discussed in Section I (pp. 21-22) *supra*, many members of the putative class have not experienced any actual damages under FDUTPA because they have never and will never experience any coil failure caused by formicary corrosion.  The only way for the Court to determine who has suffered losses and who has not would be to conduct highly individualized inquires of each class member.

---

[27] *See also Cohen*, 259 F.R.D. at 644 (predominance was not satisfied because the failure of the allegedly defective product "could be due to a number of reasons including use of the Implant Product on a patient who was not a candidate and mistakes made by the doctor in inserting the Implant Product.  Thus, to determine causation, the Court would have to engage in [] mini-trials"); *Breakstone*, 2010 WL 2164440, at *6 ("Even where engines did manifest problems, there would be individual issues as to whether the problems were caused by the allegedly defective design and whether remedial steps taken by Caterpillar (such as repairs provided) had fixed the problem"); *Kia Motors*, 985 So. 2d at 1140 ("Without individual inquiry, there is no way in adjudicating this case to determine whether the need for a particular repair was based on normal wear, a defective original part… environmental factors… poor workmanship by a third party, or individual driving habits.").

Thus, even if this issue does not defeat the requirement of ascertainability, it nevertheless warrants denying class certification. *E.g.*, *Rollins, Inc.*, 951 So. 2d at 873.

b.  Plaintiffs Have Not Proposed Any Viable or Relevant Way to <u>Measure Damages on a Classwide Basis</u>

Even if this were not, by itself, sufficient to defeat certification, predominance is still lacking because the damages theory proffered by Plaintiffs through Mr. Bernatowicz is (a) not based on an allowable measure of damages under FDUTPA, (b) not tied to the legal theory of liability (failure to disclose), and (c) not substantiated by any actual data.

**<u>The damages theory is not based on an allowable measure of damages under FDUPTA</u>**: The allowable damages under FDUTPA is "the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." *Democratic Republic of the Congo v. Air Capital Grp., LLC*, 614 F. App'x 460, 472 (11th Cir. 2015). Plaintiffs' damages expert, Mr. Bernatowicz, sets forth a damages model that allegedly measures this difference through a "diminution in value methodology." October 23, 2015 Declaration of Frank Bernatowicz ("Bernatowicz Decl.") (Ex. 32) at 12-18; *see also* Mot. at 26. However, glaringly absent from Plaintiffs' Motion is a description of how Mr. Bernatowicz purports to measure the alleged diminution. In his report, Mr. Bernatowicz suggests that he will use data that has not yet been supplied (nor could it ever be supplied) to determine a so-called "increased failure rate" associated with the alleged defect and he will then multiply that rate by "a reasonable estimate of the items necessary (labor and incidentals) to repair the Copper Evaporator Coil of the aforementioned HVAC Units." Bernatowicz Decl. at ¶ 51 (Ex. 32). Mr. Bernatowicz explained that his model purports to value the "obsolescence" associated with the alleged defect by the "cost to repair the product, in the sense of repairs that are not covered by the product and product warranties currently." Bernatowicz Dep. at 206:8-13 (Ex. 18); *see also id.* at 205:19-206:7 (Ex. 18) ("the obsolescence is in the fact that you have to take something that's broken and fix it, to put it back in the same position it should have been in…. So I'm measuring the amount necessary to put it back in the same position as labor and incidentals").

Mr. Bernatowicz's method clearly does not actually measure (a) the market value of the HVAC units as delivered, or (b) the market value of the HVAC units in the condition in which they should have been delivered – *i.e*, the measures that are relevant to allowable damages under

33

FDUTPA. Indeed, his model makes no attempt to ascertain any such values. *See id.* at 270:5-17 (Ex. 18) (testifying that he has not analyzed the prices consumers are charged for NGHL HVAC units). Thus – at the outset – the model is deficient. As illustrated by the court's holding in *Montgomery*, which addressed a FDUTPA claim premised on alleged defects in an aircraft, in order to determine the "market value depletion due to the 'deceptive' trade practice," an inquiry would "automatically" be necessary into "(1) when and where each plane was purchased, (2) when the plane was sold [], and (3) the current market value of each plane." 209 F.R.D. at 230. An analysis would also have to be done regarding "individual defenses concerning maintenance and other matters unique to each aircraft." *Id.* Mr. Bernatowicz's model makes no attempt to determine any of this information as it pertains to the relevant HVAC units. Nor could he determine that information on a classwide basis given that the value of NGHL HVAC units is highly variable.[28]

Instead of focusing on the relevant values, Mr. Bernatowicz's model is focused solely on quantifying the estimated "cost to repair the product," and compensating class members for a percentage of that cost that is reflective of some unquantifiable "increased failure rate." Bernatowicz Dep. at 206:8-13; 212:5-10 (Ex. 18). But it is black letter law that costs related to repair services "do[] not reflect a diminution in market value" and therefore are "not recoverable" under FDUTPA. *Clear Marine Ventures, Ltd. v. Brunswick Corp.*, 2010 WL 528477, at *4 (S.D. Fla. Feb. 11, 2010); *see also Rollins, Inc.*, 951 So. 2d at 869-870 (the recovery afforded under FDUTPA "precludes the recovery of costs to repair a building resulting from a deficient inspection for termites" and "does not include diminution in value … caused by termite damage"). Thus, Plaintiffs' proposed damages model is not based on an appropriate measure of damages under FDUPTA.

**The damages theory is not tied to the legal theory of liability**: The Supreme Court recently clarified in *Comcast Corp. v. Behrend*, that damages must be "susceptible of

---

[28] Prices for NGHL HVAC units vary widely based on a multitude of factors. There are dozens of different NGHL brands as well as many different sizes, efficiency levels and upgrades, factors that all materially impact the price of the units. Sidebottom Decl. at 11-12 (Ex. 20). Moreover, NGHL does not provide any suggested list prices for its units nor does it have any control over how prices are set. Rather, each individual HVAC contractor determines the price of the HVAC unit and contractors charge widely varying prices even for the very same units based on, *inter alia*, their geographical location, years of experience and qualifications, a surplus of inventory, additional accessories, various rebate or incentive programs, etc. *Id.* at 12.

measurement across the entire class for purposes of Rule 23(b)(3)."  133 S. Ct. 1426, 1433 (2013).  As part of that requirement, a model purporting to serve as evidence of damages in a class action "must be consistent with [the plaintiff's] liability case" and must "measure only those damages attributable to that theory [of liability]."  *Id.*  This Court reiterated that principle in *J.M. Smucker*, stating that if the plaintiff has not demonstrated that its proposed model will isolate the allowable damages stemming from the "actions that created the legal liability," the plaintiff does not have "sufficient evidence of a viable damages model capable of estimating damages on a class-wide basis."  303 F.R.D. at 698.

Here, Plaintiffs theory of liability is premised on NGHL's alleged failure to disclose the coils' susceptibility to formicary corrosion.  *See* Am. Compl. ¶ 21.  As Plaintiffs describe in their Motion, they "have been damaged by [NGHL's] failure to inform them of the defective copper evaporator coils in their HVAC units, preventing them from making fully informed decisions about the purchases."  Mot. at 24.  In other words, NGHL is purportedly liable under FDUTPA because it delivered HVAC units that were not accompanied by a disclosure regarding formicary corrosion, when it should have delivered HVAC units that were accompanied by such a disclosure.  Accordingly, the appropriate measure of damages here – one that measures those damages attributable to the actual theory of liability – is the difference between the market value of NGHL HVAC units as delivered without any disclosure regarding formicary corrosion (*i.e.*, the condition in which they were allegedly delivered) and the market value of NGHL HVAC Units had they been delivered with a disclosure regarding formicary corrosion  (*i.e.*, the condition in which they allegedly should have been delivered).  *See* November 6, 2015 Declaration of David Duffus ("Duffus Decl.") (Ex. 33) at ¶¶ 41, 43.

While Plaintiffs contend their damages model is based on a return to class members "of the difference between what they paid for he HVAC units and what they would have paid had the alleged defect been disclosed at the point of purchase," Mot. at 26, that description is directly contrary to Mr. Bernatowicz's description of his proposed model.  Mr. Bernatowicz testified that a consumer's knowledge of the alleged defect is "irrelevant" to his damages methodology and that his model compensates consumers "regardless of whether a consumer knows about that defect."  Bernatowicz Dep. at 88:10-25 (Ex. 18).  Thus, the model does not actually measure the damages putative class members incurred by virtue of NGHL's purported failure to disclose.

**There is no data to substantiate the proposed damages model**.  Even if Plaintiffs' theory is – in the abstract – a viable model, they still have not provided any evidence as to how it can be applied in this case.  In *J.M. Smucker*, this Court held that "more is required than simply '[d]emonstrating the existence of a viable damages model.'"  303 F.R.D. at 698.  "[B]ald, unsupported assertion[s] that [a] method will work" are insufficient; rather, Plaintiffs must present "hard-and-fast evidence" that the model is "capable of measurement."  *Id.*  This requirement stems from the Supreme Court's admonition that a proposed damages model must be more than merely "speculative" or "arbitrary," because the predominance requirement would otherwise be reduced "to a nullity."  *Comcast*, 133 S. Ct. at 1433; *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 254 (D.C. Cir. 2013) ("It is not enough to submit a questionable model whose unsubstantiated claims cannot be refuted through *a priori* analysis.").

Here, as in *J.M. Smucker*, the Plaintiffs – through Mr. Bernatowicz – have "made no attempt to present the Court with an example or summary of the model to be applied."  303 F.R.D. at 697.  As Mr. Bernatowicz conceded, he has not quantified the relevant rates, nor has he seen the data needed to do so.  Bernatowicz Dep. at 86: 5-20 (Ex. 18); *see also id.* at 167:18-22; 305:11-14 ("I don't have any data in my formula.  It's a formula"; "I didn't look at the data. That's not been my charge.").  Rather, Mr. Bernatowicz contends that he is relying on "someone else [to] do the liability analysis" and "provide [the] input to me… I'll take those inputs, put it in my model, and be able to calculate damages."  *Id.* at 86:5-20 (Ex. 18); *see also id.* at 120:21-121:16 ("[t]he purpose of the model is to accept input information from others that are looking at liability issues").  Here, however – with merits discovery now closed – the data Mr. Bernatowicz says will be provided does not actually exist and has not been presented by Plaintiffs in *any* form.

Nor could such data *ever* be provided.  First, Mr. Bernatowicz has not identified any way to identify the number of HVAC units sold into Florida (one of the data points needed for his model), other than his "assumption" that NGHL maintains that data.  *Id.* at 194:13-15.  Tellingly, when asked for the basis of this assumption, Mr. Bernatowicz commented "You know what an assumption means.  I'm making an assumption.  *I'm assuming facts not necessarily into evidence*…"  *Id.* at 183:1-3.  Indeed, that assumption runs contrary to the facts in evidence, which make clear that NGHL does not maintain such data.  NGHL Answers, Answer No. 15 (Ex. 7); Lattanzi Oct. 2 Dep. at 54:22-55:10; 60:25-61:13 (Ex. 10).  There is also no way to ascertain

the relevant failure rates.  As Mr. Bernatowicz concedes, the warranty claim data does not indicate the cause of any claimed coil failure, including whether the claimed failure is due to formicary corrosion.  Bernatowicz Dep. at 137:23-138:3 (Ex. 18).  Thus, whatever "increased failure rate" may be quantified, there is no way to determine that this increased rate has anything to do with the "claimable failures" (*i.e.*, a failure due to formicary corrosion), rather than some other phenomenon.  Mr. Bernatowicz's response to this issue is simply that "if you're making a claim, I presume you're going to have some support behind that claim."  *Id.* at 305:24-306:21. Bernatowicz's unsupported "presum[ptions]" epitomize the types of speculations and insufficient assurances that have been rejected by the Supreme Court in *Comcast*, 133 S. Ct. at 1433.  *See also Kottaras v. Whole Foods Market*, 281 F.R.D. 16, 26 (S.D. Fla. 2012) (rejecting damages methodology that was based on the hypothetical results of discovery, because "not only had [the expert] not yet performed a single regression, but also he could not even tell the Court the precise analyses he intended to undertake.").

Incredibly, Mr. Bernatowicz also suggested at his deposition that if he cannot get the proper inputs, then he will simply "do something." Bernatowicz Dep. at 214:5-11; 232:1-8 (Ex. 18) ("I will work with what I have.") When asked how exactly he would do that, Mr. Bernatowicz testified: "I can always put together a model, and I can give you a model result, based upon *hypotheticals*…. So it's not specifically dependent on getting reasonable information to come up with a conclusion.  I can take whatever input and come up with a conclusion."  *Id.* at 155:7-156:9; *see also id.* at 154:21-155:3 ("Well, I can always effectuate my model on hypotheticals").  Mr. Bernatowicz's speculative "hypotheticals" – which do not appear to be based on the receipt of reasonable information – are plainly unacceptable under *Comcast*. 133 S. Ct. at 1433 (noting the need to determine whether a methodology for classifying damages is "a just and reasonable inference or speculative" (citation omitted)); *Prohias*, 485 F. Supp. 2d at 1337 (damages model that requires "hypothetical" evidence "is too speculative to be the premise of an 'actual injury' under Article III").

In light of these fundamental issues, it is clear that Plaintiffs do not have any evidence – let alone "hard-and-fast evidence" – that their proposed model is actually "capable of measurement."  *J.M. Smucker*, 303 F.R.D. at 698.  Accordingly, "individual issues [will] predominate over common questions on the third leg of the FDUTPA liability tripod."  *Rollins*, 951 So. 2d at 873.

WE L:\95491175\8\65859.0025

     4.    *The Unjust Enrichment Claim Cannot be Certified Because Most Putative Class Members Cannot Claim Any Inequity*

The Eleventh Circuit has held that in order to adjudicate an unjust enrichment claim, the Court "must examine the particular circumstances of an individual case and assure itself that, without a remedy, inequity would result or persist.  Due to the necessity of this inquiry into the individualized equities attendant to each class member, courts, including ours, have found unjust enrichment claims inappropriate for class action treatment." *Vega*, 564 F.3d at 1274-75.  In *Vega*, the Eleventh Circuit held that because the inquiry into equities is individualized, "'common questions will rarely, if ever, predominate an unjust enrichment claim." *Id.* (finding no common evidence regarding the circumstances under which the defendant accepted a benefit from each class member because, although the named plaintiff was unaware of the challenged compensation policies, other sales colleagues were "well-versed in T-Mobile's procedures"); *see also In re Motions to Certify Classes*, 715 F. Supp. 2d at 1284 (finding unjust enrichment claim could not be certified because each class member had different understandings, expectations and beliefs regarding the alleged wrongful charges, and those who expected or knew of the charges could not claim injustice); *Kunzelmann v. Wells Fargo Bank, N.A.*, 2013 WL 139913, at *10 (S.D. Fla. Jan. 10, 2013) (denying certification of unjust enrichment claim due to "the need to examine the state of mind of each [class member], including awareness, expectations, and conduct").

The facts warranting the denial of Plaintiffs' unjust enrichment claim are largely the same as those that warrant the denial of their FDUTPA claim: namely, that the circumstances of most putative class members do not result in any inequity.  Many were not exposed to the allegedly deceptive act in the first place either because they did not consult any materials in advance of purchase or because they were aware of the allegedly omitted information.  Moreover, many would not have changed their purchasing behavior had they been informed of the allegedly omitted information.  And critically, the large majority of putative class members own an HVAC unit that has either functioned without incident or has experienced problems unrelated to the defect alleged in this matter.  In all of these aforementioned circumstances, putative class members cannot claim any inequity.  Nor can Plaintiffs prove damages on a classwide basis for all of same reasons discussed in Section III.A.3 (pp. 32-38) *supra*.  Because the court must therefore examine the particular circumstances of each individual class member in order to

determine whether there has been any inequity (and, if so, the nature of the damages), certification of the unjust enrichment claim is inappropriate.  *Vega*, 564 F.3d at 1274.

## IV.   Plaintiffs' Rule 23(B)(2) Class Cannot Be Certified Because Injunctive Or Declaratory Relief Is Not The Predominant Relief Sought

Plaintiffs also request certification of a Rule 23(b)(2) class.  *See* Mot. at 20-21.  However, they ignore the fact that certification of a Rule 23(b)(2) class is inappropriate where "monetary relief is not incidental to the injunctive or declaratory relief" sought or "when each class member would be entitled to an individualized award of monetary damages." *Dukes*, 131 S. Ct. at 2557; *see also Murray v. Auslander*, 244 F.3d 807, 812 (11th Cir. 2001) (Rule 23(b)(2) class cannot is inappropriate where injunctive or declaratory relief is  not the "predominant relief sought").

Here, the entirety of Plaintiffs' Amended Complaint is premised on monetary relief. *See, e.g.,* Am. Compl. ¶ 4 ("Plaintiffs and putative Class Members incurred out-of-pocket expenses..."); ¶ 30 ("Plaintiffs and Class Members were forced to incur monetary damages…"); ¶ 68 ("Plaintiffs and putative Class Members have incurred unreasonable expenses…"); ¶ 75 ("Plaintiffs and putative Class Members have suffered a loss of money…").  Thus, injunctive or declaratory relief cannot possibly be the predominant relief sought by Plaintiffs.  Certainly, Plaintiffs have made no effort to demonstrate in their Motion that monetary damages are "merely incidental to the injunctive relief." *E.g., J.M. Smucker*, 303 F.R.D. at 700 (denying Rule 23(b)(2) class because "Plaintiff has made no effort to demonstrate that the money damages, which appear to be the primary remedy sought, are merely incidental to the injunctive relief.").[29] As such, certification of the Rule 23(b)(2) class is inappropriate.

## V.   Plaintiffs Cannot Circumvent Rule 23(B)(3)'s Predominance Requirement By Seeking The Certification Of An Issues-Only Class

Implicitly acknowledging the critical hurdles they face in obtaining class certification, Plaintiffs request that the Court certify a narrow issues-only class under Rule 23(c)(4) on the issues of "(1) whether the HVAC units are defective; and (2) [NGHL's] prior knowledge of the defect."  Mot. at 27.  Plaintiffs also appear to suggest that this issues-only class would need to

---

[29] If, as their injunctive relief arguments imply, Plaintiffs are seeking to "split" the consumers into two groups and include in the Rule 23(b)(2) class consumers who have not experienced the defect because they have no monetary damages, Mot. at 21, n. 9, then it is undisputed that mini-trials will be necessary to determine which consumers are part of which class.  This highly individualized process is fatal to class certification.  *See* section I (pp. 21-22) *supra*.

address the issue of whether NGHL failed to "disclos[e] the defect to consumers."  Mot. at 28. Notwithstanding the fact that these questions cannot even themselves be answered on a common basis, *see* Sections II-III (pp. 24-29) *supra*, it is clear that Plaintiffs are attempting to use Rule 23(c)(4) to do an end-run around the predominance requirements of Rule 23(b)(3).  As this Court held in *J.M. Smucker* in rejecting a similar request, "courts 'have emphatically rejected attempts to use the (c)(4) process for certifying individual issues as a means for achieving an end run around the (b)(3 predominance requirement.'"  303 F.R.D. at 700 (citation omitted).  Thus, certification of an issue class is inappropriate if the cause of action as a whole does not satisfy Rule 23(b)(3)'s predominance requirement.  *Id.*; *see also O'Neill*, 243 F.R.D. at 481-82 ("Nor may the Court certify a single issue when the case as a whole fails to meet the requirements of Rule 23"); *Perez v. Metabolife Int'l*, 218 F.R.D. 262, 273 (S.D. Fla. 2003) (The "predominance requirement cannot be satisfied by seeking to repeatedly split the claims pursuant to Rule 23(c)(4)," when, as here, "liability as to Plaintiffs is, overall, a highly individuated issue" (citation omitted)).

Here, as discussed in Sections II-III (pp. 24-32) *supra*, there a host of reasons why the case as a whole fails to meet the requirements of Rule 23(b).  Notably, the issues of exposure and causation are highly individualized and critical to any liability determination.  Thus, as in *Perez*, "any efficiency gained by deciding the common elements will be lost when separate trials are required for each class member in order to determine each member's entitlement to the requested relief."  *Id.*  Plaintiffs' request to certify a Rule 23(c)(4) class must therefore be denied.

***

In sum, Plaintiffs have not met their burden of showing that their putative class can be certified.  On the contrary, this case presents the precise factual circumstances in which class certification is inappropriate, whether under Rule 23(b)(2), (b)(3), or (c)(4).

WE L:\95491175\8\65859.0025

Dated: December 18, 2015

/s/ Edward Soto
Edward Soto (Fla. Bar No. 0265144)
Edward.Soto@weil.com
Erica Rutner (Fla. Bar No. (0070510)
Erica.Rutner@weil.com
Pravin Patel (Fla. Bar No. 0099939)
Pravin.Patel@Weil.com
Weil, Gotshal & Manges LLP
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone:  (305) 577-3100
Fax:  (305) 374-7159

Arvin Maskin (*pro hac vice*)
Arvin.Maskin@weil.com
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Fax: (212) 310-8007

*Attorneys for Nortek Global HVAC, LLC*

## REQUEST FOR HEARING

Pursuant to Southern District of Florida Local Rule 7.1(b)(2), NGHL hereby respectfully requests a hearing on Plaintiffs' Motion and the issues raised in NGHL's Opposition to the Motion (the "Opposition").  NGHL believes oral argument would be helpful to the Court in considering and adjudicating the Motion, and would significantly aid the decisional process given the numerous and diverse legal and factual issues raised by the Motion and Opposition.

NGHL estimates that two (2) hours for each side is required for argument, and accordingly requests a total hearing time of four (4) hours.

WEIL:\95491175\8\65859.0025

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 18, 2015, a true and correct copy of the foregoing instrument was served on the following counsel of record, as provided below:

*Via Email and Fedex*

| | |
|---|---|
| Jonathan B. Cohen | Gregory F. Coleman |
| Rachel Soffin | Mark E. Silvey |
| Cherrie Behrens | Lisa A. White |
| MORGAN & MORGAN | Greg Coleman Law PC |
| 201 N. Franklin St., 7th Floor | First Tennessee Plaza |
| Tampa, FL 33602 | 800 S. Gay St., Suite 1100 |
| jcohen@forthepeople.com | Knoxville, TN   37929 |
| rsoffin@forthepeople.com | greg@gregcolemanlaw.com |
| cbehrens@forthepeople.com | mark@gregcolemanlaw.com |
| | lisa@gregcolemanlaw.com |

Jonathan Shub
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
jshub@kohnswift.com

Russell D. Paul
Shanon J. Carson
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
rpaul@bm.net
scarson@bm.net

/s/ Edward Soto
Edward Soto (Fla. Bar No. 0265144)
Edward.Soto@weil.com
Weil, Gotshal & Manges LLP
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone:  (305) 577-3100
Fax:  (305) 374-7159

*Attorneys for Nortek Global HVAC, LLC*

WE L:\95491175\8\65859.0025