UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  14-CIV-21884-BLOOM/Valle

DEBRA HARRIS and BARBARA
STARK, on behalf of themselves
and all others similarly situated,

      Plaintiff,

v.

NORTEK GLOBAL HVAC LLC,

      Defendant.

_____/

## ORDER ON MOTION FOR CLASS CERTIFICATION

**THIS CAUSE** is before the Court on Plaintiffs Debra Harris' ("Harris") and Barbara

Stark's ("Stark") (collectively, "Plaintiffs") Motion for Class Certification (the "Motion"), ECF

Nos. [84] and [85]. The Court has reviewed the Motion, all supporting and opposing

submissions, and the record in this case, and is otherwise fully advised. For the reasons set forth

below, the Court denies the Motion.

## I. BACKGROUND

Plaintiffs are Florida consumers who purchased residential heating, ventilation, and air

conditioning ("HVAC") systems manufactured by Defendant, Nortek Global HVAC, LLC

("Defendant").[1] Plaintiffs allege that the Defendant's HVAC systems contained defective copper

evaporator coils. Defendant is one of seven major manufacturers of HVAC units in the United

States and has manufactured and sold residential HVAC units since the mid-to-late 1980s. Mot.,

---

[1] During the pendency of this matter, Defendant, Nordyne LLC, changed its name to Nortek Global
HVAC, LLC.

ECF No. [84] at 2-3 (citing Lattanzi Dep. I, ECF No. [85-1]). Defendant's HVAC units are distributed and sold under thirteen different brand names, falling into three categories.[2]

An HVAC unit contains three components: (1) an evaporator coil; (2) a condenser coil; and (3) a compressor. The three components are joined together in a hermetic system that contains refrigerant, which is necessary in order to cool the residence, and oil, which is necessary to lubricate the compressor. *Id.* at 3. Defendant manufactures two principal types of HVAC units: split systems—in which the components are split between two units—and packaged systems—in which all components are contained within a single housing located outside the home. *Id.* at 3-4. In both these systems, the evaporator and condenser coils are the key components for removing heat from inside the home and exhausting that heat outside the home.

According to Plaintiffs, any leak in the hermetic system—in either the evaporator or the condenser coils—is "catastrophic to the operation of the system because it eliminates the possibility of transferring heat from the inside of the house to the outside via the refrigerant." *Id.* at 5. Evaporator coils should not fail during ordinary use and should function properly during the entire lifespan of a typical air condition unit, purportedly sixteen years on average. *Id.* An evaporator coil that has leaked refrigerant is replaced with a new evaporator coil and new refrigerant must be added in order for the system to resume its normal functions. *Id.* According to Plaintiffs, an evaporator coil that leaks refrigerant is defective and that in a properly functioning system without defects, there should never be a need to add refrigerant. *Id.*

Formicary corrosion, which can only form in the presence of moisture, oxygen, organic acid, and copper, is a type of corrosion that can develop on the copper tubing of an evaporator coil. Defendant's Response to Motion ("Resp."), ECF No. [94-1] at 3; Mot. at 5. Plaintiffs allege

---

[2] The brands and categories are as follows: (1) Premium Brands: Frigidaire, Tappan, Westinghouse, Broan, and NuTone; (2) Standard Brands: Gibson, Philco, Kelvinator; (3) Aftermarket Brands: Miller, Intertherm.

that Defendant's HVAC units share a uniform defect—specifically, that the units contain copper evaporator coils that are susceptible to corrosion (chiefly formicary corrosion)—resulting in leaks and premature failure. Plaintiffs further allege that Defendant had knowledge of the defective copper evaporator coils prior to selling its residential HVAC units and continued to manufacture, distribute, and sell units containing defective copper evaporator coils for years, while its competitors eliminated copper coils from their respective HVAC products. In 2010, Defendant began phasing out standard copper evaporator coils in residential HVAC units, introducing and transitioning to Luvata evaporator coils, which also contain copper but in a different alloy than its traditional copper coils. Mot. at 10; Lattanzi Depo. II, ECF No. [85-2] at 22. According to Plaintiffs, Defendant began transitioning from copper to aluminum evaporator coils in 2011, a transition which is still ongoing. Mot. at 10.

The named Plaintiffs, Debra Harris and Barbara Stark, each have experienced failures in their HVAC units produced by Defendant. In October 2011, Harris purchased two new Broan brand heating and cooling systems for her new home from GreenDog Energy Solutions LLC ("GreenDog"), a retailer of residential heating and cooling systems. She paid $10,000 for the two systems. Ex. 38, Oct. 19, 2011 Invoice, ECF No. [84-7]. Throughout 2012 and 2013, one of the units was not working properly and GreenDog determined that the evaporator coil had failed and was leaking. Harris Dep., ECF No. [91-28] at 72-73. GreenDog installed new aluminum evaporator coils in her system and replenished the refrigerant, costing her $280.00 out-of-pocket for the refrigerant and labor. Ex. 41, Oct. 11, 2011 Invoice, ECF No. [84-8]. In 2015, the other unit in Harris' home stopped functioning properly. Harris Dep. at 76. GreenDog made three service calls to her home and charged her $269.95. *Id.* at 77-81. It was determined that the copper evaporator coil had failed and needed to be replaced. The parties agreed to perform

testing on the removed coil, but neither a definitive cause nor the exact location of the leak was determined as a result of this testing. Mot. at 11.

In February 2012, Plaintiff Stark had a new Frigidaire brand heating and cooling system installed from Cliff's Air Conditioning & Heating Inc. ("Cliff's"). She paid $3,950 for the system. Ex. 44, Feb. 1, 2012 Invoice, ECF No. [84-9]. In September 2013, the system was not generating cool air, and Cliff's inspected the system, determining that the copper evaporator coil had failed and refrigerant had leaked. Stark Dep. ECF No. [91-22] at 81-84. Aluminum evaporator coils could not be retrofitted to her system and Cliff's replaced the failed coils with new, identical copper evaporator coils and replenished the refrigerant. *Id.* Stark paid $250.00 out-of-pocket for labor and replacement refrigerant. Ex. 48, Sept. 27, 2013 Invoice, ECF No. [84-10]. Plaintiffs allege that Stark will continue to sustain unnecessary, out-of-pocket losses for labor and refrigerant due to the continued existence of defective evaporator coils, which will ultimately cause her HVAC system to prematurely fail again. Mot. at 12.

Plaintiffs, on behalf of themselves and all others similarly situated, seek certification of the following class and subclass:

> Class: All consumers within the state of Florida who purchased residential HVAC systems manufactured by Defendant containing copper evaporator coils between May 21, 2010 and the present.

> Subclass: All consumers within the state of Florida who purchased residential HVAC systems manufactured by Defendant containing copper evaporator coils between May 21, 2010 and the present, and whose evaporator coils have failed.[3]

Mot. at 1.

---

[3] Excluded from the class and subclass are: (a) any consumers who purchased residential HVAC units manufactured by Defendant that included warranties covering labor and refrigerant; (b) any Judge or Magistrate presiding over this action and members of their families; (c) Defendant and any entity in which Defendant has a controlling interest or which has a controlling interest in Defendant; (d) Defendant's legal representatives, assigns, and successors; and (e) all persons who properly execute and file a timely request for exclusion from the class and/or subclass.

Plaintiffs' First Amended Complaint ("Am. Compl."), ECF No. [36], alleges classwide claims for violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 *et seq.*, (Count I) and unjust enrichment (Count II).

## II. STANDARD FOR CLASS CERTIFICATIONS

In order to certify a class action, the named plaintiffs must have standing, and the putative classes must "satisfy an implicit ascertainability requirement, the four requirements listed in Rule 23(a), and the requirements listed in any of Rule 23(b)(1), (2), or (3)." *Karhu v. Vital Pharm., Inc.*, 621 F. App'x 945, 946 (11th Cir. 2015) (citing *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012)); *see Fitzpatrick v. General Mills, Inc.*, 635 F.3d 1279, 1282 (11th Cir. 2011) ("[T]he putative class must meet each of the four requirements specified in [Rule] 23(a), as well as at least one of the three requirements set forth in [Rule] 23(b)."); *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1233 (11th Cir. 2000) ("A class action may be maintained only when it satisfies all of the requirements of Fed. R. Civ. P. 23(a) and at least one of the alternative requirements of Rule 23(b)."). "Under Rule 23(a), every putative class first must satisfy the prerequisites of numerosity, commonality, typicality, and adequacy of representation." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1265 (11th Cir. 2009) (citing Fed. R. Civ. P.23(a); *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1187-88 (11th Cir. 2003)).

Here, Plaintiffs seek a hybrid certification pursuant to Rule 23(b)(3) and 23(b)(2) as they seek both monetary and equitable relief. Rule 23(b)(3) requires a plaintiff to prove that "[c]ommon questions [ ] predominate over any questions affecting only individual members; and class resolution [is] superior to other available methods for the fair and efficient adjudication of the controversy." *Amchem Products, Inc. v. Windson*, 521 U.S. 591, 615 (1997) (citation

omitted).  On the other hand, certification is appropriate under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

"The burden of establishing these requirements is on the plaintiff who seeks to certify the suit as a class action."  *Heaven v. Trust Co. Bank*, 118 F.3d 735, 737 (11th Cir. 1997); s*ee also Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1233 (11th Cir. 2000). The moving party "must affirmatively demonstrate his compliance" with the class certification requirements. *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1432 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011)). That is, "a party must not only be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a) [but also] satisfy *through evidentiary proof* at least one of the provisions of Rule 23(b)." *Id.* (some emphasis added).

"A district court must conduct a rigorous analysis of the Rule 23 prerequisites before certifying a class."  *Vega*, 564 F.3d at 1266 (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996)).  District courts have broad discretion in deciding whether to certify a class. *De Leon-Granados v. Eller & Sons Trees, Inc.*, 497 F.3d 1214, 1218 (11th Cir. 2007) (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 711 (11th Cir. 2004)); *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1569 (11th Cir. 1992).  "Although a district court is not to determine the merits of a case at the certification stage, sometimes 'it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.'"

*Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529, 534 (S.D. Fla. 2015) (quoting *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1309 (11th Cir. 2008).

## III. DISCUSSION

### A.    Individual Standing

"It is well-settled in the Eleventh Circuit that prior to the certification of a class, and before undertaking any of the analysis under Rule 23, the district court must determine that at least one named class representative has Article III standing to raise each class claim." *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 679 (S.D. Fla. 2004) (citing *Wolf Prado-Steiman v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000); *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987) ("[A]ny analysis of class certification must begin with the issue of standing.")). Indeed, "[o]nly after the court determines the issues for which the named plaintiffs have standing should it address the question whether the named plaintiffs have representative capacity, as defined by Rule 23(a), to assert the rights of others." *Griffin*, 823 F.2d at 1482. "To have standing, a plaintiff must show (1) he has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to conduct of the defendant; and (3) it is likely, not just merely speculative, that the injury will be redressed by a favorable decision." *Kelly v. Harris*, 331 F.3d 817, 819-20 (11th Cir. 2003).

Defendant does not directly challenge Harris' or Stark's individual standing. However, Article III standing is a threshold jurisdictional issue, which the Court must itself address at the onset. *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005) (citing *Dillard v. Baldwin County Comm'rs*, 225 F.3d 1271, 1275 (11th Cir. 2000)). Here, the named Plaintiffs have alleged that they suffered cognizable injuries in the form of purchasing an allegedly defect

HVAC unit, which experienced refrigerant leakage and failure. Monetary and/or injunctive relief pursuant to a favorable decision would redress those injuries. As such, Plaintiffs' individual standing requirement is satisfied.

B.      **Ascertainability**

"Before a district court may grant a motion for class certification, a plaintiff seeking to represent a proposed class must establish that the proposed class is 'adequately defined and clearly ascertainable.'" *Randolph v. J.M. Smucker Co.*, 303 F.R.D. 679, 684 (S.D. Fla. 2014) (quoting *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012) (citing *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970))).[4] This threshold issue of ascertainability relates to whether the putative class can be identified: "[a]n identifiable class exists if its members can be ascertained by reference to objective criteria." *Bussey v. Macon Cnty. Greyhound Park, Inc.*, 562 F. App'x 782, 787 (11th Cir.2014) (citing *Fogarazzo v. Lehman Bros., Inc.*, 263 F.R.D. 90, 97 (S.D.N.Y. 2009)). These "objective criteria" should be "administratively feasible," meaning that the identification of class members should be "a manageable process that does not require much, if any, individual inquiries." *Id.* (citation omitted) (reversing district court decision finding ascertainability satisfied where class could be identified by reference to the defendant's records). If a plaintiff fails to demonstrate that the putative class is clearly ascertainable, then class certification is properly denied.  *See Walewski v. Zenimax Media, Inc.*, 502 F. App'x 857, 861 (11th Cir. 2012) (affirming denial of class certification because class was not adequately defined or clearly ascertainable); *Perez v. Metabolfe Int'l, Inc.*, 218 F.R.D. 262, 269 (S.D. Fla. 2003) ("A court should deny class certification where the class definitions are overly broad, amorphous, and vague, or where the

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

number of individualized determinations required to determine class membership becomes too administratively difficult.").

Defendant takes issue with the putative class and subclass for two reasons. First, Defendant argues that Plaintiffs' proposed class is not adequately defined because it includes class members who did not suffer any loss. Second, assuming the proposed class and subclass are sufficient, Defendant contends that Plaintiff has not offered a feasible mechanism for identifying members of the class. The Court addresses these matters in turn.

### i. Class Definition

Defendant argues that Plaintiffs' proposed class is legally insufficient because it includes class members whose products have not manifested a defect and who "did not suffer any loss." Defendant contends that the proposed class, therefore, is not adequately defined. Courts appear split in both this district and other jurisdictions on whether a plaintiff may seek certification of a class that includes those whose products have not yet experienced the purported deficiency.

Plaintiffs assert that Defendant, by arguing that certain putative class members have not experienced loss, mischaracterizes the class. According to Plaintiff, the class includes all HVAC units containing copper coils because the use of copper increases the propensity to fail due to formicary corrosion. Thus, the loss occurred immediately at the point of sale when the class member purchased a defective HVAC unit. The HVAC unit was not what each member was led to believe he or she was purchasing, whether or not every class member actually had confirmed failure due to formicary corrosion. Many courts have indeed allowed plaintiffs to certify classes which include all purchasers of an allegedly defect product within a specified time and location, reasoning that a trier of fact could find that the alleged defect—an increased propensity to manifest the deficiency—existed at the time of purchase. *See, e.g., Sanchez-Knutson v. Ford*

*Motor Co.*, 310 F.R.D 529, 535 (S.D. Fla. 2015) ("[T]he Court finds that Plaintiff has provided sufficient direct evidence before this Court, at this stage in the litigation, to demonstrate that Plaintiff's Explorer may be found to share the same defect as all others in its product line. . . . [I]f a jury believes Plaintiff's evidence, it could find that the alleged defect was manifested when the Explorer came off the assembly line, regardless of whether . . . every putative class member has driven the vehicle in such a way that caused exhaust to enter the passenger cabin. . . . Thus, the Court finds that the ascertainability element has been met."); *Matthews v. American Honda Motor Co., Inc.*, 2012 WL 2520675, at * 4 (S.D. Fla. June 6, 2012) ("Florida law suggests that [Plaintiff] sustained damage the moment that she purchased the vehicle with the alleged defect, even though the alleged defect did not manifest for several years."); *Point Blank Solutions, Inc. v. Toyobo Am., Inc.*, 2011 WL 1833366, at *6 (S.D. Fla. May 13, 2011) ("Under FDUTPA, Plaintiffs suffered damages when they purchased something that was not what they were led to believe they were purchasing. Therefore, Plaintiffs' FDUTPA claim accrued when they purchased the [product], not when they discovered that the [product] was unusable.").

In contrast, other courts have held that a class cannot be maintained that includes putative class members who have merely purchased a potentially defective product and have not yet experienced the failure or deficiency. *See, e.g., Breakstone v. Caterpillar, Inc.*, 2010 WL 2164440, at *6 (S.D. Fla. May 26, 2010) ("it is inappropriate to certify a class containing both individuals who have 'manifested a deficiency' and those whose product has 'performed satisfactorily' since the injuries of the putative class members with no manifest injury only have speculative damages"); *Briehl v. Gen. Motors Corp.*, 172 F.3d 623, 628 (8th Cir. 1999) ("Courts have been particularly vigilant in requiring allegations of injury or damages in products liability cases. . . . In this case, the Plaintiffs have not alleged that their ABS brakes have malfunctioned

or failed. In fact, the Plaintiffs affirmatively state that their purported class excludes any claim for personal injury or property damage caused by brake failure. . . . Where, as in this case, a product performs satisfactorily and never exhibits an alleged defect, no cause of action lies."); *Carlson v. General Motors Corp.*, 883 F.2d 287 (4th Cir. 1989) (affirming district court's dismissal of plaintiffs who alleged damages attributable only to lost resale value); [5]

Courts have been particularly reluctant pertaining to the question of whether a plaintiff can seek certification of classes that include both class members whose product has manifested the deficiency and those whose product has performed satisfactorily. *See Kia Motors America Corp v. Butler*, 985 So.2d 1133, 1139 (Fla. 3d DCA 2008) ("[T]he class representative in this case seeks compensation not only for class members whose brakes have manifested a deficiency, but also for those whose brakes have performed satisfactorily. In certifying the class, the trial court deviated from the majority of jurisdictions, which consistently have denied class recovery on the type of theory the class representative presses in this case."). In overturning two district courts' certification of classes seeking "risk of failure" and diminished vehicle resale value arising out of their operation of vehicles with Bridgestone/Firestone tires that never failed, Judge Easterbrook of the Seventh Circuit notably explained that a mixed system of class compensation—for those who had been physically injured in addition to those whose products

---

[5] Defendants also cite to the Eleventh Circuit's decision in *Walewski v. Zenimax Media, Inc.* as standing for the proposition that a class is not adequately defined where it includes class members who "did not suffer any loss." 502 F. App'x 857, 861 (11th Cir. 2012). However, as urged by Plaintiffs, a closer look at the context of this quotation reveals that *Walewski* is not necessarily a general statement of law that class members with products whose defects have not manifested cannot meet the ascertainability requirement. Rather, the opinion quotes with approval the district court's decision finding the class definition overbroad for many reasons, including a lack of limitation on who sold and purchased the product, new or used, at what time, and whether they ever experienced the defect. *See id.* ("Under the definition, for example, a video store which buys the second hand game from a consumer and resells it for more than it paid for it is included in the class, despite the fact that the entity itself never experienced the animation defect (as it never played the game) and did not suffer any loss."). As Plaintiffs have argued that the loss indeed occurred at point of sale, this opinion is not dispositive to the issue.

had functioned properly—would lead to overcompensation and perverse incentives. *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1017 (7th Cir. 2002). ("If tort law fully compensates those who are physically injured, then any recoveries by those whose products function properly mean excess compensation. As a result, most states would not entertain the sort of theory that plaintiffs press."). The Court reasoned that a consistent system that provides either damages to every buyer of an allegedly defective product *or* damages to every injured buyer creates "the right compensation and the right incentives." *Id.* A mixed system that compensates both buyers of the defective product and those who had experienced the failure, however, "overcompensates buyers and leads to excess precautions." *Id.*[6]

Although the Amended Complaint includes only the proposed class—all Florida customers who purchased one of Defendant's HVAC units that include copper evaporator coils—Plaintiffs in their Motion for Class Certification also propose a subclass of those who have experienced failure of their copper evaporator coils. *See* Am. Compl. ¶ 49; Mot. at 1. Plaintiffs seek separate damages for this class and subclass. Specifically, Plaintiffs' damages expert, Frank Bernatowicz, proposes a diminution of damages model subdivided into two subclasses, one for those who have not yet experienced a failure and another for those who have

---

[6] To illustrate, the Court provided the following example: "Defendant sells 1,000 widgets for $10,000 apiece. If 1% of the widgets fail as the result of an avoidable defect, and each injury creates a loss of $50,000, then the group will experience 10 failures, and the injured buyers will be entitled to $500,000 in tort damages. That is full compensation for the entire loss; a manufacturer should not spend more than $500,000 to make the widgets safer. . . . Suppose, however, that uninjured buyers could collect damages on the theory that the risk of failure made each widget less valuable; had they known of the risk of injury, these buyers contend, they would have paid only $9,500 per widget—for the expected per-widget cost of injury is $500, and each buyer could have used the difference in price to purchase insurance (or to self-insure, bearing the risk in exchange for the lower price). On this theory the 990 uninjured buyers would collect a total of $495,000. The manufacturer's full outlay of $995,000 ($500,000 to the 10 injured buyers + $495,000 to the 990 uninjured buyers) would be nearly double the total loss created by the product's defect. This would both overcompensate buyers as a class and induce manufacturers to spend inefficiently much to reduce the risks of defects. A consistent system—$500 in damages to every buyer, or $50,000 in damages to every injured buyer—creates both the right compensation and the right incentives. A mixed system overcompensates buyers and leads to excess precautions." *Bridgestone*, 288 F.3d at 1017 n.1.

experienced refrigerant loss and/or failure of the HVAC unit. Bernatowicz Decl., ECF No. [91-32] ¶¶ 44-58, 59- 75. For those who have experienced an actual failure, Plaintiffs' valuation approach includes an additional diminution in value beyond the amount calculated for those who have not yet experienced a failure. *See id.* ¶¶ 59-63. Plaintiffs alternatively propose a damages model based on unjust enrichment, which also divides the damages model into these two subclasses, each with distinct models for compensation. *See id.* ¶¶ 76-87, 88-98.

The Court is reluctant to certify a class that seeks compensation for both those who purchased one of Defendant's HVAC units containing copper coils and a subclass for those whose unit experienced failure. Even if Plaintiffs' theory of increased propensity to manifest the deficiency amounts to a loss sufficient to maintain a class action—which it is not entirely clear that it can—Plaintiffs seek to certify a class and subclass that includes putative class members who have experienced the deficiency and those who have not, thus providing a structure that potentially overcompensates class members.

### ii. Identification of Class Members

Defendant also contends that Plaintiffs have not offered an administratively feasible mechanism for identifying members of the class and subclass. Plaintiffs assert that membership can be determined through a query of Defendant's warranty registration and warranty claim databases, as well as by tracking sales through the supply chain sales databases belonging to Defendant, distributors, and contractors. Specifically, each HVAC unit—a substantial product for which consumers maintain purchase, installation, and maintenance records and warranty information—is assigned a distinct serial number, which can be used to determine the quantity and purchasers of the HVAC units sold, the brand of the HVAC units, and the manufacturing dates of the coils contained in the units. Evaporator coils are assigned part numbers and unique

serial numbers distinct from the serial numbers assigned to the HVAC units containing them. Copper coils are assigned different part numbers than aluminum coils, providing an additional opportunity to identify warranty claims submitted to Defendant in connection with copper coils, including consumer and claim data (including claim type, failed part number, component note, coil serial number, cause, and installation and service date) which is maintained in Defendant's database, Data Warehouse. *See* Lattanzi Dep. I at 165-166; Lattanzi Dep. II at 71. Plaintiffs assert that is it possible to ascertain members through information captured and stored by Defendant as well as by subpoenaing the record of Defendant's distributors and contractors/installers.

Defendant argues that there is insufficient data indicating which consumers have purchased a warranty that covers labor and refrigerant—a group that Plaintiffs explicitly exclude from the class definition. Specifically, these warranties come from many sources, including a consumer's HVAC contractor or from home insurance policies, requiring individual inquiry of each consumer to ascertain that information. *See* Lattanzi Dep. I at 151-152. Further, Defendant argues that only a percentage of consumers register their units, and, given that Defendant is two or three steps removed from the consumer, Plaintiffs would need to track the identity of many class members through the distribution chain, a strategy for which Plaintiffs have provided no explanation as to how this could accurately be accomplished.

The Court is cognizant of the duality of this argument—a defendant could simply avoid having to defend a class action complaint by failing to keep, or at least feigning to keep, records adequate to identify putative members of the class. However, the Court also recognizes that the burden of establishing the requirements to class certification rests squarely with Plaintiffs. *See Heaven v. Trust Co. Bank*, 118 F.3d 735, 737 (11th Cir. 1997). Here, based on the testimony of

Mr. Lattanzi, a Nortek corporate representative, Plaintiffs urge that Defendant does indeed maintain a database that tracks warranty claims, sales and shipment information, and residential HVAC unit sales to distributors. Plaintiffs can then subpoena records of Defendant's distributors and contractors. *See* Repl. at 9; *see also* Bernatowicz Dep., ECF No. [94-17] at 183-185 (explaining that although a certain percentage do not register their units, information can be tracked through contractors and then distributors).[7] However, as is demonstrated by Plaintiff Harris' own contractor, many HVAC contractors may no longer have sales records dating to the beginning of the class period. *See* Saccone Dep., ECF No. [91-14] at 14-18 (Harris' contractor testifying that Harris' sales records were lost when his company moved locations). Moreover, Plaintiffs exclude from the class definition those consumers who have a warranty that covers labor and refrigerant. Plaintiffs have failed to identify a feasible manner in which to identify these consumers, as labor and refrigerant warranty plans often come from varying sources, including contractors and "whole" homeowner insurance policies. *See* Lattanzi Dep. I at 151-152 (explaining that Nortek brands, with the exception of Miller and Intertherm, do not provide warranties for labor and refrigerant and that there are other sources for labor and refrigerant coverage, such as contractors and whole home appliance insurance).

Because courts have been reluctant to certify classes that compensate both those who have experienced product failures as well as those who have not, and because there remain significant questions as to the feasibility of Plaintiffs' proposed mechanism for identifying members of the class and subclass, the ascertainability factor weighs strongly against

---

[7] "[B]ecause I know they don't all register their unit, what would be the next most persuasive piece of information? It would be the contactor and his documentation as to where the installation occurred. And then I would go upstream and go into the distributor, if I didn't have contractor information. But by that time, I've probably exhausted 98 percent of all the claimants. It's going to be highly unlikely that you're not going to see a contractor's name behind most of the installations . . . ." Bernatowicz Dep. at 184.

certification of the proposed class and subclass. Nor is the Court willing to allow amendment of the class and subclass definition given the remaining deficiencies discussed further below.

### C.    Rule 23(a) Requirements

#### i.    Commonality

The commonality requirement of Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2); *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1355 (11th Cir. 2009) (quoting *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001)) ("Under the Rule 23(a)(2) commonality requirement, a class action must involve issues that are susceptible to class-wide proof."). Plaintiffs face a "low hurdle" in bearing this "light" burden, as commonality "does not require that all questions of law and fact raised be common." *Williams*, 568 F.3d at 1356; *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1268 (11th Cir. 2009). "In short, the commonality requirement requires proof the court can resolve the questions of law or fact in 'one stroke.'" *Randolph v. J.M. Smucker Co.*, 303 F.R.D. 679, 693 (S.D. Fla. 2014). That said, "[w]hat matters to class certification is not the raising of common 'questions'—even in droves— but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (quotation omitted). That is, commonality requires a common question capable of common resolution. *See*, *e.g.*, *Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674, 685 (S.D. Fla. 2013). However, "the commonality requirement demands only that there be questions of law or fact common to the class. This part of the rule does not require that all the questions of law and fact raised by the dispute be common, or that the common questions of law or fact "predominate" over individual issues. *Vega* 564 F.3d at 1268 (citations and quotations omitted).

Plaintiffs assert that Rule 23(a)'s commonality prerequisite is satisfied in the instant action because the common, central questions—including whether Defendant knew or should have known of the alleged defect, whether it failed to disclose the alleged defect, and whether a failure to disclose the alleged defect prevents Plaintiffs and class members from receiving the benefit of their bargain—would produce the same answers for all class and subclass members. *See* Mot. at 14. Further, Plaintiff argues that because the claims of the prospective class members involve the same alleged defect in the HVAC units containing the same key components, they are susceptible to common proof sufficient to meet the commonality requirement. According to Plaintiffs, the common evidence includes Defendant's own documents, "which confirm that all copper evaporator coils . . . have the potential to prematurely fail and leak refrigerant as a result of formicary corrosion." Mot. at 16.

Defendant contends that all of the purported common questions described by Plaintiffs are premised on a determination that there is a common defect in Defendant's copper evaporator coils—a premise that, Defendant argues, Plaintiff has failed to support with even a "scintilla of evidence." Resp. at 24. Defendant's argument, however reaches further into the merits of the case than is required for determination of this motion.

More convincing is Defendant's argument that because the class definition includes every single copper evaporator coil model manufactured by Defendant in the last five years and there are material differences between these models that impact the propagation and risk of formicary corrosion, Plaintiffs cannot demonstrate a common defect. However, Rule 23(a)(2) "does not require that the factual circumstances underlying the members' claims be identical as long as there are questions of law and fact common to the class." *Dahlgren's Nursery, Inc. v. E.I. du Pont de Nemours and Co., Inc.*, 1994 WL 1251231, at *5 (S.D. Fla. Oct. 30, 1994)). Here, as

there are several significant common questions of law and fact, Plaintiffs satisfy the "relatively modest standards of commonality." *Id.* These arguments are more appropriately addressed with regard to Rule 23(b)(3) predominance, discussed *infra*.

### ii.    Numerosity, Typicality, and Adequacy

Defendant does not challenge the remaining Rule 23(a) requirements. In the interest of completeness, the Court will briefly address each of these factors.

### a.  Numerosity

Under Rule 23(a)(1), Plaintiffs must demonstrate that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[A]lthough mere allegations of numerosity are insufficient to meet this prerequisite, a plaintiff need not show the precise number of members in the class." *Vega*, 564 at 1267. "Rule 23(a)(1) imposes a generally low hurdle." *Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674, 684 (S.D. Fla. 2013). "[W]hile there is no fixed numerosity rule, generally less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors." *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986) (citations and quotations omitted).

According to Plaintiffs, Defendant sold 78,632 HVAC units containing copper evaporator coils to Florida distributors during the class period. Those distributors then sold the HVAC units to contractors who installed the units in the homes of consumers such as the named Plaintiffs. Plaintiffs maintain that even if Defendant's distributors sold 98% of its units outside of Florida, there would still be more than 1,000 putative class members in the state. Further, discovery established that 5,335 evaporator coil warranty claims were submitted to Defendant by or on behalf of Florida consumers during the class period. Accordingly, the Court finds the numerosity requirement satisfied.

### b.  Typicality

Rule 23(a) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3). "[T]he typicality requirement is permissive: representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *In re Checking Account Overdraft Litig.*, 275 F.R.D. 666, 674 (S.D. Fla. 2011) (citing *Brown v. SCI Funeral Servs. of Fla., Inc.*, 212 F.R.D. 602, 605 (S.D. Fla. 2003)). In order to demonstrate typicality, the plaintiff must generally establish that a "sufficient nexus exists between the legal claims of the named class representatives and those of individual class members to warrant class certification." *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001) (citing *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1569 n. 8 (11th Cir. 1992)). Stated differently, "[t]he claim of a class representative is typical of 'the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory.'" *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1356-57 (11th Cir. 2009) (quoting *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984)).

Here, the representative claims are "reasonably co-extensive" with those of the absent class members. Plaintiffs' claims arise from the same events and alleged misconduct and are based on the same legal theories as the putative class members—Plaintiffs allege that they purchased Defendant's HVAC units, that they were unaware of the allegedly defective evaporator coils within the units, that the units failed to perform as they were reasonably expected, and that they would not have purchased these HVAC units or would have paid less for them had they known of the allegedly defective copper coils. As such, the Plaintiffs have met the typicality requirement under Rule 23(a)(3).

c. **Adequacy**

Rule 23(a)(4) requires a showing that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy-of-representation requirement 'encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action.'" *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1323 (11th Cir. 2008) (quoting *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003)); *see also Fabricant v. Sears Roebuck*, 202 F.R.D. 310, 314-15 (S.D. Fla. 2001) ("Rule 23(a)(4)'s adequacy requirement has two components: (1) the class representative has no interests antagonistic to the class and (2) class counsel possesses the competence to undertake the litigation."); *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 727 (11th Cir. 1987) ("The inquiry into whether named plaintiffs will represent the potential class with sufficient vigor to satisfy the adequacy requirement of Rule 23(a)(4) most often has been described to involve questions of whether plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation and of whether plaintiffs have interests antagonistic to those of the rest of the class.").  In addition, "[m]isconduct by class counsel that creates a serious doubt that counsel will represent the class loyally requires denial of class certification." *Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, 918 (7th Cir. 2011); *but see Busby*, 513 F.3d at 1323-24 ("[O]nly the most egregious misconduct on the part of plaintiffs' lawyer could ever arguably justify denial of class status.") (quoting *Halverson v. Convenient Food Mart, Inc.*, 458 F.2d 927, 932 (7th Cir. 1972)). "[T]he Court is required to evaluate any conflicting interests of the class representative and the adequacy of class

CASE NO.  14-CIV-21884-BLOOM/Valle

counsel." *Ass'n For Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 464 (S.D. Fla. 2002).

Plaintiffs argue that they do not have any interests that are contrary or antagonistic to those of the class or subclass and that their interests indeed align as they were harmed in the same manner. Plaintiffs also assert that they have vigorously prosecuted this action and are knowledgeable about the claims and willing and able to protect the interest of the putative class members. They have also actively participated in discovery by responding to interrogatories, producing documents, making their homes available for inspection, and appearing for their depositions and mediation. Further, Plaintiffs maintain that they have retained counsel experienced in consumer class actions and claims such as those alleged in this case. Defendants have not challenged this requirement and, upon review of the record, the Court finds that the representative parties will fairly and adequately represent the interests of the class. Plaintiffs have therefore satisfied the adequacy requirement.

**D.     Rule 23(b)**

In addition to satisfying the four requirements of Rule 23(a), Plaintiffs must meet one of the alternative requirements set forth in Rule 23(b). Plaintiffs seek class certification under both Rule 23(b)(2) and Rule 23(b)(3).

**i.     Rule 23(b)(2)**

Rule 23(b)(2) provides for certification of a class when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "A declaratory or injunctive relief class pursuant to Rule 23(b)(2) is appropriate only if 'the predominant relief sought is injunctive or declaratory.'" *DWFII Corp. v. State Farm Mut.*

CASE NO.  14-CIV-21884-BLOOM/Valle

*Auto. Ins. Co.,* 469 F. App'x 762, 765 (11th Cir. 2012) (quoting *Murray v. Auslander*, 244 F.3d 807, 812 (11th Cir. 2001)). "Monetary relief predominates in (b)(2) class actions unless it is *incidental* to requested injunctive or declaratory relief." *Murray*, 244 F.3d at 812 (emphasis in original) (internal quotation and citation omitted). "Money damages are 'incidental' only when class members would be 'automatically entitled' to them once class-wide liability is established. *Colomar v. Mercy Hosp., Inc.*, 242 F.R.D. 671, 682 (S.D. Fla. 2007). As the Eleventh Circuit has explained:

> [Incidental damages are] damages that flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief . . . . Ideally, incidental damages should be only those to which class members automatically would be entitled once liability to the class (or subclass) as a whole is established . . . . Liability for incidental damages should not . . . entail complex individualized determinations. Thus, incidental damages will, by definition, be more in the nature of a group remedy, consistent with the forms of relief intended for (b)(2) class actions.

*Murray,* 244 F.3d at 812 (quoting *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 415 (5th Cir. 1998)); *see also DWFII Corp. v. State Farm Mut. Auto. Ins. Co.,* 469 F. App'x 762, 765 (11th Cir. 2012).

Plaintiffs, in their Amended Complaint, specifically seek to "enjoin[] Defendant from continuing to violate FDUTPA." Am. Compl. ¶ 78(d). In their Motion for Class Certification, Plaintiffs expand that they seek, *inter alia*, a declaratory judgment that the copper coils in Defendant's HVAC unit are susceptible to formicary corrosion and premature failure; injunctive relief barring Defendant from continuing to sell HVAC units without disclosing the alleged defect to consumers; and injunctive relief requiring Defendant to extend the coverage of its warranty to cover labor and refrigerant costs. Mot. at 21. Plaintiffs assert that they do not seek any amount of money from Defendant pursuant to these forms of declaratory and injunctive relief. However, Plaintiffs' argument is unfounded. FDUTPA, the cause of action under which

Plaintiffs seek injunctive relief, provides for—and Plaintiffs indeed seek—declaratory and injunctive relief as well as monetary damages. *See* Fla. Stat. § 501.211(1) ("anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part"); *id.* §501.211(2) ("a person who has suffered a loss as a result of a violation of [FDUTPA] . . . may recover actual damages"). The Court must therefore determine whether the predominant relief sought by Plaintiffs is injunctive and/or declaratory.

Courts have found relief to be predominantly related to money damages when the operative consumer protection statute provides for monetary damages as the appropriate relief. *See Agan v. Katzman & Korr, P.A.*, 222 F.R.D. 692, 702 (S.D. Fla. 2004) ("The Court finds that the appropriate relief in this cause of action predominantly relates to money damages. . . . The FDCPA [Fair Debt Collection Practices Act] and the FCCPA [Florida Consumer Collection Practices Act] specifically provide for money damages as the appropriate relief. . . . Moreover, the Court finds that declaratory relief is not merely incidental to monetary damages, but rather predominates a cause of action under the FDCPA and FCCPA."). *See also Karhu v. Vital Pharm., Inc.*, 2014 WL 815253, at * 11 (S.D. Fla. Mar. 3, 2014) (holding that plaintiff had not presented a proper Rule 23(b)(2) action, when seeking monetary and injunctive relief for breach of warranty, unjust enrichment, and FDUTPA, noting that "the injunctive relief [plaintiff] requests takes a back seat to the apparent principal aim of the lawsuit: to recover damages based on the amount each individual class member paid for an ineffective product"); *Rosen v. J.M. Auto Inc.*, 270 F.R.D. 675, 684 (S.D. Fla. 2009) (finding class certification claim alleging violations of express and implied warranty and FDUTPA inappropriate under 23(b)(2) because,

although Plaintiffs request actual injunctive or declaratory relief, the court cannot say that monetary damages are merely incidental to that relief).

As in *Agan*, the operative statute here, FDUTPA, provides for—and Plaintiffs seek—monetary damages in addition to injunctive or declaratory relief. Further, Plaintiffs' Amended Complaint is largely premised on monetary relief—to recover damages based upon the amount each individual class member paid for a defective product and/or for labor costs. *See, e.g.,* Am. Compl, ECF No. [36] ¶ 68, 69 (FDUTPA claim) ("Plaintiffs and putative Class Members have incurred unreasonable expenses for replacement refrigerant and associated labor costs . . . [and] are entitled to recover actual damages"); *id.* ¶ 65 (FDUTPA claim) (Plaintiffs and putative Class Members [sustained] actual damages, including out-of-pocket costs for replacing refrigerant and labor"); *id.* ¶ 67 (FDUTPA claim) (Plaintiffs and putative Class members . . . would not have purchased HVAC systems manufactured by [Defendant], or would have paid less for them, had they known that the systems contained defective copper evaporator coils"); *id.* ¶ 75 (Unjust Enrichment claim) ("Plaintiffs and putative Class Members have suffered a loss of money as a result of [Defendant's] unjust enrichment"). The Court therefore cannot say that injunctive or declaratory relief predominate or that the monetary relief sought under FDUTPA is merely incidental.

This conclusion is further supported by the fact that "[t]he members of a (b)(2) class are generally bound together through 'preexisting or continuing legal relationships' or by some significant common trait such as race or gender." *Hammett v. American Bankers Ins. Co.*, 203 F.R.D. 690, 696 (S.D. Fla. 2001) (quoting *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1155 n.8 (11th Cir. 1983)); *see also Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 614 (1997) ("Rule 23(b)(2) permits class actions for declaratory or injunctive relief where 'the party opposing the

class has acted or refused to act on grounds generally applicable to the class.' Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples."); *Henderson v. Thomas*, 289 F.R.D. 506 (M.D. Ala. 2012) ("[Rule 23(b)(2)] reflects a series of decisions involving challenges to racial segregation—conduct that was remedied by a single class order. This case [involving prisoners living with HIV who were segregated from the general population] fits squarely within Rule 23(b)(2)'s history.").

Here, the proposed class and subclass share no significant "preexisting or continuing legal relationship" or common trait beyond their purchases that form a basis for this action and "thus lack the class cohesiveness that distinguishes (b)(2) from (b)(3) actions." *Hammett*, 203 F.R.D. at 696. *Cf Anderson v. Garner*, 22 F.Supp.2d 1379 (N.D. Ga. 1997) (certifying a 23(b)(2) class of prison inmates seeking damages and injunctive relief claiming state correction officers used excessive force during "shakedowns"); *Henderson*, 289 F.R.D. 506 (certifying a 23(b)(2) class of prisoners living with HIV who were segregated from the general prison population).

Further, a party opposing the class must have acted or refused to act on grounds generally applicable to the class. "Generally applicable, as used in Rule 23(b)(2) has been interpreted to mean that the party opposing the class has acted in a consistent manner towards members of the class so that [its] actions may be viewed as part of a pattern of activity . . . to all members." *Leszczynski v. Allianz Ins.*, 176 F.R.D. 659, 673 (S.D. Fla. 1997) (internal quotation and citation omitted). As discussed *infra*, there exist material differences, including in the potential susceptibility to formicary corrosion, among the copper evaporator coils used in Defendant's HVAC units throughout the class period. Thus, the Court is hesitant to determine that Defendant has acted in a manner generally applicable or consistent toward all members of the class. For the reasons stated above, the Court declines to certify the class action under Rule 23(b)(2).

CASE NO.  14-CIV-21884-BLOOM/Valle

ii.     **Rule 23(b)(3)**

Rule 23(b)(3) certification is appropriate if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Thus, Rule 23(b)(3) has two elements: (1) predominance and (2) superiority.

"That common questions of law or fact predominate over individualized questions means that 'the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof.'" *Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 694 (S.D. Fla. 2004) (quoting *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1558 (11th Cir. 1989)). *See also City of St. Petersburg v. Total Containment, Inc.*, 265 F.R.D. 630, 637 (S.D. Fla. 2010) ("Predominance is lacking and certification is inappropriate under Rule 23(b)(3) where the case does not lend itself to generalized proof tending to prove or disprove the elements of plaintiffs' claims.") (citing *Dahlgren's Nursery, Inc. v. E.I. du Pont de Nemours and Co., Inc.*, 1994 WL 1251231, at *9 (S.D. Fla. Oct. 30, 1994)). "The predominance inquiry focuses on 'the legal or factual questions that qualify each class member's case as a genuine controversy,' and is 'far more demanding' than Rule 23(a)'s commonality requirement." *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir. 1997) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997)).  Indeed, a district court conducting a Rule 23(b)(3) inquiry is obligated to take a "close look" at whether common questions predominate. *See id.* (citations omitted). Because predominance relates to individual issues regarding liability, the elements of the underlying cause of action are critical.

Plaintiffs argue that common issues predominate here because this action arises from a common course of conduct, and Plaintiffs' claims do not depend on any individualized issues. However, as explained below, Plaintiffs' claims include elements in which individual issues predominate.

### a.  FDUTPA

A plaintiff asserting a claim under FDUTPA must establish: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *12 Baptist Hosp., Inc. v. Baker*, 84 So.3d 1200, 1204 (Fla. 1st DCA 2012) (quoting *Kia Motors Am. Corp. v. Butler*, 985 So.2d 1133, 1140 (Fla. 3d DCA 2008)). In order to satisfy the predominance requirement, a plaintiff must demonstrate that the individual injury resulting from the alleged FDUTPA violation was "capable of proof at trial through evidence that [was] common to the class rather than individual to its members." *Comcast,* 133 S.Ct. at 1430 (citation omitted). Additionally, this inquiry requires that the alleged damages emanating from the injury be "measurable on a class-wide basis through use of a common methodology." *Id.* (internal quotation and citation omitted).

### 1.  *Deceptive Act or Unfair Practice*

Defendant argues that Plaintiffs cannot prove a classwide deceptive act because the putative class members were not uniformly exposed to the alleged deception. Defendants contend that given the highly individualized nature of the circumstances surrounding an HVAC purchase, classwide exposure to a deceptive act cannot be inferred. Specifically, Defendant highlights the many alleged disclosures made by Defendant during the class period, including its attempts to communicate with its consumers through materials it provides to its distributors and contractors and through its consumer website. Resp. at 13. Defendant further argues that many putative class members, who were not provided—or made any effort to obtain—information

regarding the system they intended to purchase, were never exposed to any materials in which the allegedly omitted information could have plausibly been disclosed.

A "deception" occurs when there is "a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Zlotnick v. Premier Sales Group*, 480 F.3d 1281, 1284 (11th Cir.2007) (citation and quotation omitted). While some courts have hinted that the causation requirement requires a plaintiff to prove that the consumer actually rely on the deceptive practice*, see, e.g., Kais v. Mansiana Ocean Residences, LLC*, 2009 WL 825763, at *2 (S.D. Fla. Mar. 25, 2009) (dismissing claim because Plaintiff failed to state that the alleged deceptive act "caused him to enter into the contract . . . or caused him to act differently in any way"), the Eleventh Circuit has plainly resolved this issue, stating that "FDUTPA does not require a plaintiff to prove actual reliance on the alleged conduct." *Cold Stone Creamery, Inc. v. Lenora Foods I, LLC*, 332 F. App'x. 565, 567 (11th Cir. 2009) (quotation omitted); *see also Davis v. Powertel, Inc.*, 776 So.2d 971, 973 (Fla. 1st DCA 2000) ("A party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue*.*"); *State, Office of Attorney Gen., Dep't of Legal Affairs v. Commerce Commercial Leasing, LLC*, 946 So.2d 1253, 1258 (Fla. 1st DCA 2007) ("A deceptive or unfair trade practice constitutes a somewhat unique tortious act because, although it is similar to a claim of fraud, it is different in that, unlike fraud, a party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue." (internal quotation omitted)). Instead of actual reliance, a plaintiff must simply prove that "the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances." *Cold Stone*, 332 F. App'x. at 567. This same standard applies whether the action is brought by an individual consumer or as a class action. *See id.* (citing *Latman v. Costa Cruise Lines, N.V.*, 758

28

So.2d 699 (Fla. 3d DCA 2000)) ("[M]embers of a class proceeding under [FDUTPA] need not prove individual reliance on the alleged representation."); *see also Davis*, 776 So.2d at 974.

Because a plaintiff need not demonstrate actual reliance, Defendant's argument is unfounded. A trier of fact need not conduct an individual inquiry into the level of exposure experienced by each putative class member, but rather, following the objective standard, would determine whether Defendant's practice was likely to deceive a consumer acting reasonably in the same circumstances, including all potential opportunities for disclosure.

### 2. Causation

Individual questions of fact predominate as to the second FDUTPA element of causation. "In order for the consumer to be entitled to any relief under FDUTPA, the consumer must not only plead and prove that the conduct complained of was unfair and deceptive but the consumer must also plead and prove that he or she was aggrieved by the unfair and deceptive act." *Cohen v. Implant Innovations, Inc.*, 259 F.R.D. 617, 644 (S.D. Fla. 2008) (quoting *Macias v. HBC of Fla., Inc.*, 694 So.2d 88, 90 (Fla. 3d DCA 1997)).

As discussed *supra*, the class definition includes every single copper evaporator coil model manufactured by Defendant in the last five years. Defendant asserts that there are material differences between these models that impact the propagation and risk of formicary corrosion. In particular, in 2010, Defendant began manufacturing Luvata anteater coils ("Luvata coils"). According to Matthew Henry Lattanzi, the director of warranty and technical service at Nortek, these Luvata coils have been shown to be 50 times more resistant to formicary corrosion. *See* Lattanzi Depo. II, ECF No. [85-2] at 22.[8] Defendant argues that Plaintiffs cannot rely on

---

[8] "The [Luvata] anteater technology was put into place in the beginning of—or during the year 2010 as a precautionary measure because of what we were hearing in the marketplace with formicary corrosion. That alloy is a standard C-122 copper with zinc and tin additives. In other words, what I'm trying to say is

common evidence to prove a defect with both Luvata coils and standard copper evaporator coils.

Plaintiffs did not specifically address this argument in their Reply Brief, but did assert in their

Motion that Luvata coils also contain copper but in a different alloy and that Luvata coils, like

their traditional copper predecessors, have also been the subject of complaints and warranty

claims for alleged leaks. Mot. at 10 (citing Lattanzi Dep. II at 24:3-6, 99:1-5). In support of this

contention, Plaintiffs cite to Lattanzi's deposition testimony, in which he conceded that there

have been warranty claims submitted to Nortek for alleged coil leaks on the Luvata coils. *See*

Lattanzi Dep. II at 24:3-6. However, that there have been warranty claims submitted for Luvata

coils is not sufficient to negate the evidence presented by Defendant that the Luvata coils and

standard copper coils are significantly different, particularly with regard to their susceptibility to

corrosion. *See id.* at 23 ("[W]e have never seen a Luvata anteater coil exhibit formicary

corrosion. . . . Q. . . .Have any of the anteater coils . . . been tested internally or by any third party

to determine the presence of formicary corrosion? A. No, we have not seen a return that would

warrant sending one of those anteater coils out for testing."); Dorste Decl., ECF No. [94-12] ¶ 29

("Reacting to the perceived increase in formicary corrosion, copper supplier Luvata developed

copper tubing from an alloy including Tin and Zinc (Alloy C422), which rendered the tube fifty-

times more resistant to formicary corrosion than standard copper. In 2010, [Defendant] began

adopting this material in its evaporator coil designs as a further measure to address formicary

corrosion complaints.").

　　　Courts have routinely found differences amongst various models fatal to class

certification. *See, e.g., Kia Motors Amer. Corp. v. Butler*, 985 So. 2d 1133, 1138 (Fla., 3d DCA

2008) ("[I]t cannot be disputed that the component and design changes . . . resulted in significant

---

that alloy was designed by Luvata specifically to prevent formicary corrosion. Their testing indicates it's
50 times better in terms of preventing formicary corrosion versus a standard evaporator coil.").

differences in the performance of the [vehicle's] front breaks over the three model years at issue here. It is therefore scientifically and logically impossible to conclude that any performance issues for these three model years were the result of a common design."); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1081 (6th Cir. 1996) (holding the district court erred in finding the commonality requirement satisfied although at least ten different models of the product existed and an expert testified that there was no common cause of malfunction); *Dahlgren's Nursery, Inc. v. E.I. du Pont de Nemours and Co., Inc.*, 1994 WL 1251231, at *11 (S.D. Fla. Oct. 30, 1994)) ("[T]he manufacture, distribution, and sale of the fungicide is not common throughout the class. The class description identifies five different types of Benlate. Each was formulated, packaged, stored, and distributed over a four year period, in a dozen different campaigns, and by a variety of non-parties to this litigation. On the issues of negligence and product defect, therefore, the court would necessarily hear detailed evidence with respect to each Benlate campaign.").

Here, Plaintiffs allege that consumers would not have purchased HVAC systems manufactured by Defendant, or would have paid less for them, had they known that the systems contained defective copper evaporator coils. Further, Plaintiffs allege that as a result of Defendant's unfair and deceptive acts, Plaintiffs and class members have incurred unreasonable expenses for replacement refrigerant and associated labor costs and are entitled to recover actual damages. An essential question to answer, therefore, is whether indeed "the copper evaporator coils are uniformly defective, causing refrigerant to prematurely leak from Defendant's HVAC systems." Am. Compl. ¶ 53(b). However, because the Luvata coils and standard copper coils used in Defendant's HVAC units throughout the class period contain material differences that may impact the propagation and risk of formicary corrosion, Plaintiffs cannot demonstrate a

design common to the proposed class. Determining whether the use of copper coils indeed led to an increased propensity for failure among Defendant's HVAC units would, therefore, require individualized proof. *See St. Petersburg v. Total Containment, Inc.*, 265 F.R.D. 630, 637 (S.D. Fla. 2010). Accordingly, individual issues of fact predominate over the common issues in demonstrating whether the class members were actually aggrieved by Defendant's alleged deceptive practice.

Nor can consumers whose HVAC units contain Luvata coils be easily excluded from the class without individual inquiry. As explained by Mr. Lattanzi, when Defendant started introducing Luvata coils, they did not change the model number or SKU in every HVAC unit. It is therefore "difficult to . . . ascertain whether a given part is made with Luvata or made with standard copper." Lattanzi Dep. II at 24: 13-24; *id.* at 27:5-18 ("[I]s there a way that the distributors can determine whether they have Luvata coils or they have these standard copper evaporator coils? . . . In some cases we change the model number. In other cases we didn't. If we change the model number, then you can tell."). Indeed, "one would need to bring [the coil] back and physically examine it to make that determination." *Id.* Further, the transition to Luvata coils has been inconsistent, with certain periods of time during which Luvata coils were used in production and others during which they were not. *Id.* at 24:25-25:12; Dorste Decl. ¶ 29 ("Shortages in the supply of tubing produced with alloy C422 prevented [Defendant] from using this alloy in all of its products at that time [of adopting the material]. By the end of 2010, however, the vast majority of all copper tubes used by [Defendant] to produce copper tube/aluminum fin evaporator coils had been changed to this alloy."). Given the inconsistent transition to Luvata coils as well as the inconsistent use of distinct model numbers for the Luvata coils throughout the class period, identification and exclusion of those consumers whose HVAC

units contain Luvata coils instead of the standard copper coils would require highly individualized inquiry and would not be administratively feasible.[9]

### 3. Damages

Predominance also requires that damages resulting from the injury be measurable on a class-wide basis through use of a "common methodology." *Comcast Corp. v. Behrend,* 133 S.Ct. 1426, 1430 (2013) (internal citation and quotation omitted). "[A] model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* Although the "[c]alculations need not be exact," the Supreme Court has again instructed lower courts to conduct a "rigorous analysis" to determine whether the purported damages model fits the liability case. *Id.* at 1433. Actual damages for a claim brought under FDUTPA "is the difference in the market value of the product or service in the condition which it was delivered and its market value in the condition in which it should have been delivered...." *Rollins, Inc. v. Butland,* 951 So.2d 860, 869 (Fla. 2d DCA 2006) (citation omitted); *see also Marty v. Anheuser–Busch Companies, LLC,* 43 F.Supp.3d 1333, 1346, 2014 WL 4388415, at *10 (S.D. Fla. Sept. 5, 2014) ("[U]nder Florida law, a plaintiff who alleges that he or she has paid a premium price for a product as a result of a defendant's misrepresentation has pled damages under FDUTPA.").

Plaintiffs propose classwide damages that are measured by either the diminution in value of the HVAC units as a result of the defect or the value of Defendant's unjust enrichment. *See*

---

[9] Plaintiffs have filed a *Daubert* Motion to Exclude Opinions of Defendant's Expert Jane Sidebottom, ECF No. [111]. Plaintiffs aver that the expert testimony of Ms. Sidebottom is relevant to fairly evaluating Plaintiffs' motion for class certification and, therefore, requests the Court to conduct a *Daubert* analysis prior to a class certification decision. However, because the Court's decision does not rely upon, or even incorporate, the opinions of Ms. Sidebottom, the Court defers determination of Plaintiffs' Motion, ECF No. [111].

Bernatowicz Decl. ¶ 25. For each of these proffered damages models, Plaintiffs have subdivided the damages model into two subclasses: one for those who have not yet experienced a refrigerant leak or premature failure of the HVAC unit and another for those consumers who have experienced a leak or failure. *See* Mot. at 27 (citing Bernatowicz Decl. ¶¶ 44-58, 59-75, 76-87, 88-98). Defendant has separately filed a *Daubert* Motion seeking to exclude the opinions of Plaintiffs' damages expert, Frank Bernatowicz. However, even assuming that the damages model presented by Plaintiffs is based upon sound methodology, the Court notes with hesitancy that Plaintiffs' damages model as to the subclass of those who have experienced a refrigerant leak or failure requires individualized assessment.[10] Indeed, Mr. Bernatowicz states that the proposed calculation for damages for both diminution in value and unjust enrichment account for those items not covered by warranty, which include both actual labor and incidental costs, to be determined based upon invoices and "other documentation." *See id.* ¶¶ 65-66, 95-96 ("To ascertain actual labor and incidental costs, supporting invoices and other documentation will be required."). Although the Eleventh Circuit has held that individualized damages issues will seldom upset a case otherwise suited for class certification, "[i]t is primarily when there are significant individualized questions going to liability that the need for individualized assessments of damages is enough to preclude 23(b)(3) certification." *Owner-Operator Ind. Drivers Ass'n, Inc. v. Landstar Sys., Inc.*, 622 F.3d 1307, 1326 (11th Cir. 2010) (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1260 (11th Cir. 2004). As discussed above, there exist individualized issues as to Defendant's liability, particularly regarding the individualized proof required to demonstrate a

---

[10] Defendant has filed a *Daubert* Motion to Exclude Opinions of Plaintiffs' Expert Frank Bernatowicz, requesting the Court to conduct a *Daubert* analysis prior to its decision on class certification. As the Court's denial of class certification does not rely upon the soundness of Mr. Bernatowicz's methodology or proposed damages model, the Court defers determination of Defendant's Motion to Exclude, ECF No. [92].

defect. While the issue of damages is not necessarily determinative, the proposed individualized damages calculations therefore also weigh against a finding that common issues predominate.

Because individualized issues predominate as to the question of a common design defect, in conjunction with the proposed damages model that requires individualized proof and calculation, class certification of the FDUTPA claim is inappropriate pursuant to Rule 23(b)(3).

### b.  Unjust Enrichment Claim

Plaintiffs' unjust enrichment claim suffers for the same reason. "In Florida, the essential elements of a claim for unjust enrichment are: (1) a benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir. 2009) (quoting *Rollins, Inc. v. Butland*, 951 So.2d 860, 876 (Fla. 2d DCA 2006) (internal quotations omitted)). "[B]efore it can grant relief on this equitable claim, a court must examine the particular circumstances of an individual case and assure itself that, without a remedy, inequity would result or persist. Due to the necessity of this inquiry into the individualized equities attendant to each class member, courts . . . have found unjust enrichment claims inappropriate for class action treatment. . . . In short, common questions will rarely, if ever, predominate an unjust enrichment claim, the resolution of which turns on individualized facts." *Id.* (internal citations omitted).

Having considered the material differences between Luvata coils and standard copper coils both used throughout the class period, individualized inquiries are necessary to determine the extent to which individual inequities exist as to class members. Therefore, Plaintiffs have

failed to demonstrate that common issues of law and fact predominate as to their unjust enrichment claim.

As the Court finds that Plaintiffs have failed to meet the predominance requirement for certification pursuant to Rule 12(b)(3) as to both the FDUTPA and unjust enrichment claims, it does not reach the question of whether a class action is a superior means of adjudication. *See Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1278 (11th Cir. 2009) ("[P]redominance . . . is perhaps the central and overriding prerequisite for a Rule 23(b)((3) class.").

### iii.    Hybrid Certification

Plaintiffs may seek class certification under a hybrid of both Rule 23(b)(2) and (b)(3). "A hybrid Rule 23(b)(2) class action is one in which class members seek individual monetary relief, typically back pay, in addition to class-wide injunctive or declaratory relief." *Agan*, 222 F.R.D. at 701 (quoting *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1554 (11th Cir. 1986)). "The hybrid is litigated in a two-part process; first is the liability determination stage and second is the monetary relief stage." *Id.* (citing *Simon v. World Omni Leasing*, 146 F.R.D. 197, 203 (S.D. Ala. 1992)). To the extent that Plaintiffs seek to certify a hybrid class, the Court declines to do so, given its hesitation to grant class certification under 23(b)(2) or 23(b)(3), as discussed. *See id.* at 702 ("Because the Court declines to certify the class action under Rule 23(b)(2), the Court also denies Plaintiffs' request for a hybrid class action.").

### E.    Rule 23(c)(4)

As an alternative, Plaintiffs propose certification pursuant to Rule 23(c)(4) of a liability-only class regarding the issues of (1) whether the HVAC units are defective and (2) Defendant's prior knowledge of the defect.

36

Under Rule 23(c)(4), "an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). However, courts "have emphatically rejected attempts to use the (c)(4) process for certifying individual issues as a means for achieving an end run around the (b)(3) predominance requirement." *City of St. Petersburg v. Total Containment, Inc.,* 265 F.R.D. 630 (S.D. Fla.2010) (quoting *O'Neill v. The Home Depot U.S.A., Inc.,* 243 F.R.D. 469, 481 (S.D. Fla. 2006)). As the Court finds that predominance has not been demonstrated, certification of an issue class is also inappropriate. *See In re Am. Commercial Lines, LLC*, 2002 WL 1066743, at *13 (E.D. La. May 28, 2002) (explaining "that the cause of action as a whole must satisfy Rule 23(b)(3)'s predominance requirement, before Rule 23(c)(4) becomes available to sever common issues for class trial") (cited with approval in *Conigliaro v. Norwegian Cruise Line Ltd.*, 2006 WL 7346844, at *8 n.8 (S.D. Fla. Sept. 1, 2006)).

## IV. CONCLUSION

The Court finds that Plaintiffs have failed to demonstrate that their proposed class and subclass can be certified pursuant to Rule 23(b)(2) or Rule 23(b)(3). Nor is the Court willing to certify an issues-only class pursuant to Rule 23(c)(4). Further, there remain substantial questions about whether Plaintiffs' proposed class and subclass satisfy the ascertainability requirement. Accordingly, it is hereby

**ORDERED AND ADJUDGED** as follows:

CASE NO.  14-CIV-21884-BLOOM/Valle

1. Plaintiffs' Motion to Certify Class, ECF No. [84], is **DENIED**.

2. Plaintiff's Sealed Motion to Certify Class, ECF No. [85], is **DENIED.**

3. Defendant's Supplemental Request for Hearing on Plaintiff's Motion for Class Certification, ECF No. [106], is **DENIED**.

**DONE AND ORDERED** in Miami, Florida, this 28th day of January, 2016.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

cc:      Counsel of Record